[Crim. No. 19073. June 22, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS MACIAS OLIVAS, Defendant and Appellant.

**COUNSEL**

Cynthia K. Cohan, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline, Howard J. Schwab and Donald F. Roeschke, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Defendant Jesus Macias Olivas appeals from a judgment ordering his commitment to the California Youth Authority following a conviction of misdemeanor assault. (Pen. Code, § 240.) The question at issue is whether a misdemeanant between the ages of 16 and 21 may constitutionally be committed to the Youth Authority (Welf. & Inst. Code, § 1731.5)[1] for a term potentially longer than the maximum jail term which might have been imposed for the same offense if committed by a person over the age of 21 years. (See *In re Herrera* (1943) 23 Cal.2d 206 [143 P.2d 345]; *People* v. *Scherbing* (1949) 93 Cal.App.2d 736 [209 P.2d 796].)[2] We have concluded that the selective process which permits the extended incarceration of youthful misdemeanants constitutes a denial of equal protection of the law. We hold, therefore, that youthful misdemeanants may not constitutionally be held subject to the control of the Youth Authority for any period of time in excess of the maximum jail term which might be imposed.

### *The Challenged Classification*

At the time of his arrest defendant was 19 years of age. The court was accordingly authorized by section 1731.5 to exercise its discretion and commit him to the Youth Authority.[3] Section 1731.5 operates to divide one class of individuals, persons convicted of a public offense, into two groups. Of the entire class of persons who suffer such a conviction, only those who were under 21 years of age at the time of their apprehension and are otherwise eligible may be committed to the Youth Authority. The remainder of the class, persons 21 years of age and older, may be

---

[1] All statutory references herein are to sections of the Welfare and Institutions Code unless otherwise specified.

[2] In *Herrera* and *Scherbing*, similar challenges to this sentencing scheme were considered and rejected.

[3] Section 1731.5 permits a court to "commit to the authority any person convicted of a public offense who comes within subdivisions (a), (b), and (c), or subdivisions (a), (b), and (d), below:

"(a) Is found to be less than 21 years of age at the time of apprehension.

"(b) Is not sentenced to death, imprisonment for life, imprisonment for 90 days or less, or the payment of a fine, or after having been directed to pay a fine, defaults in the payment thereof, and is subject to imprisonment for more than 90 days under the judgment.

"(c) Is not granted probation.

"(d) Was granted probation and probation is revoked and terminated.

"The Youth Authority shall accept a person committed to it pursuant to this article if it believes that the person can be materially benefited by its reformatory and educational discipline, and if it has adequate facilities to provide such care."

subjected to only the normal range of dispositional alternatives. However, the sub-class of individuals who may be committed to the Youth Authority is more circumscribed than simply persons under 21 years of age. Since juveniles must be at least 16 years of age before they can be referred to the criminal courts for prosecution and thereafter suffer conviction of a public offense (§ 707),[4] the sub-class of persons who may be committed to the Youth Authority by reason of section 1731.5 is limited to individuals between the ages of 16 and 21 years.[5]

In order to understand how section 1731.5 results in a denial of equal protection to youthful misdemeanants such as defendant, it is necessary

[1]Section 707 provides: "In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he was 16 years of age or older, of any criminal statute or ordinance, upon motion of the petitioner made prior to the attachment of jeopardy the court shall cause the probation officer to investigate and submit a report on the behavioral patterns and social history of the minor being considered for unfitness. Following submission and consideration of the report, and of any other relevant evidence which the petitioner or the minor may wish to submit the juvenile court may find that the minor is not a fit and proper subject to be dealt with under the juvenile court law if it concludes that the minor would not be amenable to the care, treatment and training program available through the facilities of the juvenile court, based upon an evaluation of the following criteria:

"(a) The degree of criminal sophistication exhibited by the minor.

"(b) Whether the minor can be rehabilitated prior to expiration of the juvenile court's jurisdiction.

"(c) The minor's previous delinquent history.

"(d) Success of previous attempts by the juvenile court to rehabilitate the minor.

"(e) The circumstances and gravity of the offense alleged to have been committed by the minor.

"A determination that the minor is not a fit and proper subject to be dealt with under the juvenile court law may be based on any one or a combination of the factors set forth above, which shall be recited in the order of unfitness. In any case in which a hearing has been noticed pursuant to this section, the court shall postpone the taking of a plea to the petition until the conclusion of the fitness hearing, and no plea which may already have been entered shall constitute evidence at such hearing."

[5]Individuals in the sub-class of persons who may be committed to the Youth Authority under section 1731.5 may be further classified as falling within one of two groups. The first group consists of adults, i.e., persons who have reached the age of majority, 18 years (Civ. Code, § 25.1), but who are not yet 21 years of age at the time of their apprehension. The second group consists of a very limited class of juveniles between the ages of 16 and 18 years. The limitation comes as a result of the overlap between the jurisdictional age limit of the juvenile court and the classification scheme of section 1731.5, as follows.

Before a juvenile can suffer a conviction in a criminal court (and thus fall within § 1731.5), or even undergo prosecution therein, the juvenile court must first make an order that the person be prosecuted under the general law. (§ 603.) A prerequisite to such an order is a finding that the minor would not be amenable to the care, treatment, and training programs available under the Juvenile Court Law. Since one of the proper avenues of disposition under the Juvenile Court Law is a commitment to the Youth Authority (§ 731), the referral of a juvenile to the criminal courts necessarily entails a finding that the juvenile is *not* a fit subject for commitment to the Authority in most

to compare the maximum period of incarceration which may be imposed under the Penal Code with the period permitted upon commitment to the Youth Authority. Once a person is committed pursuant to section 1731.5, the Youth Authority is directed to retain that individual, except as otherwise lawfully provided, "under supervision and control so long as in its judgment such control is necessary for the protection of the public." (§ 1765, subd. (a).[6]) In the case of misdemeanants, control by the Authority is limited to a period of two years or until the person reaches his 23d birthday, whichever occurs later (§ 1770[7]), unless an order for further detention is made pursuant to sections 1800-1803.[8] In defendant's case, the maximum period of incarceration in an institution of the Youth Authority permitted by virtue of section 1770 is in excess of 3 years since he was 19 years of age at the time of his arrest and conviction. In contrast, the maximum permissible jail term which could

---

cannot subsequently be committed to the Youth Authority if the earlier finding made by the juvenile court is to be given effect in the criminal court.

There are, however, certain cases in which the earlier finding of unsuitability for commitment should not preclude a later commitment by the criminal court. Since a minor committed to the Youth Authority by a juvenile court must be released after two years of control or when he reaches 21 years of age, whichever occurs later (§ 1769; see, however, §§ 1800-1803), the juvenile court might justifiably believe that a Youth Authority commitment would be best suited for the juvenile except that rehabilitative efforts might require treatment for a longer period of time than permitted by section 1769. We have previously suggested that a juvenile court might be justified in making a finding of unfitness in such a case if its determination was supported by substantial evidence. (*Jimmy H.* v. *Superior Court* (1970) 3 Cal.3d 709, 715 [91 Cal.Rptr. 600, 478 P.2d 32].) However, since the minimum period of confinement permitted in the case of a juvenile by section 1769 is at least three years (when the juvenile is only days short of his eighteenth birthday), cases in which such a finding results in referral to the criminal courts, conviction, and subsequent Youth Authority commitment should be rare.

[6]The Youth Authority is guided in its implementation of section 1765, subdivision (a), by two further provisions of the Welfare and Institutions Code. Section 1766, subdivision (a)(6), provides: "When a person has been committed to the authority it may [d]ischarge him from its control when it is satisfied that such discharge is consistent with the protection of the public."

Section 1765, subdivision (b), provides: "The Authority shall discharge such person as soon as in its opinion there is reasonable probability that he can be given full liberty without danger to the public."

[7]Section 1770 provides: "Every person convicted of a misdemeanor and committed to the authority shall be discharged upon the expiration of a two-year period of control or when the person reaches his 23d birthday, whichever occurs later, unless an order for further detention has been made by the committing court pursuant to Article 6 (commencing with Section 1800)."

[8]Under sections 1800-1803, an order for further detention may be made upon a showing that a Youth Authority ward would be physically dangerous to the public because of a mental or physical deficiency, disorder, or abnormality. A person detained under such an order is entitled to a jury trial on the issue of dangerousness. (§ 1801.5; *In re Gary W.* (1971) 5 Cal.3d 296, 303-308 [96 Cal.Rptr. 1, 486 P.2d 1201]; *People* v. *Smith* (1971) 5 Cal.3d 313, 315-316 [96 Cal.Rptr. 13, 486 P.2d 1213].)

have been imposed on defendant as a result of his misdemeanor conviction was six months. (Pen. Code, § 241.) Had defendant been sentenced to and served the maximum possible jail term, his incarceration would have terminated months ago.[9] Because of his commitment to the Youth Authority, defendant remains incarcerated, facing a potential period of confinement several times longer than the longest jail term which might have been imposed.[10] The inequity of this situation is further highlighted when one considers that if another adult 21 years of age had taken part in the same assault which resulted in defendant's conviction, had been similarly convicted, and had then been sentenced to the maximum period of incarceration permitted in his case, that person would have been freed many months ago. Moreover, the instant case is not some isolated example of unequal treatment which has resulted only in defendant's case. Even when a youthful offender is convicted of a misdemeanor with a maximum permissible jail term of one year, commitment to the Youth Authority results, at the very least, in a doubling of the possible period of incarceration due to the two-year provision of section 1770.

To reiterate, our analysis has shown that section 1731.5 by its own terms affects a specifically designated class of individuals, persons convicted of a public offense. It divides that class into two groups and creates a sentencing scheme whereby those misdemeanants between the ages of 16 and 21 years of age are singled out for potentially longer terms of incarceration than all other misdemeanants. Furthermore, the duration of such extended incarceration is not insignificant; it may range anywhere from twice up to 28 times as long as the maximum permissible jail sentence; in terms of actual time, the length of confinement can be increased in some cases by over 6 years.

Recognition of this disparity mandates that we re-emphasize the reasons why section 1731.5 applies to youthful misdemeanants in the first place. It is because such persons have been prosecuted *as adults,*

[9]At the time that defendant's commitment to the Youth Authority was ordered, he had already spent 90 days in custody in the county jail. Under the provisions of Penal Code section 2900.6 he would have been entitled to credit for that time against any jail term which could have been imposed. Consequently, at the time he was committed to the Youth Authority, defendant could only have been required to serve an additional 90 days in the county jail if the maximum 6-month sentence had been imposed.

[10]In fact, if one considers that defendant could only have been forced to serve an additional 90 days in the county jail at the time he was sentenced (see *ante,* fn. 9), commitment to the Youth Authority increased the potential duration of his incarceration by a factor of 14.

adjudged by the same standards which apply to *any competent adult,* and convicted *as adults in adult courts.*[11] Yet, despite the fact that they are treated in the same manner as any competent adult during the process which results in their convictions, such persons may be subjected to significantly greater terms of incarceration as a result of those convictions solely by reason of their age. We have concluded that such a sentencing scheme constitutes a denial of equal protection in violation of article I, section 7, of the California Constitution and the Fourteenth Amendment to the United States Constitution.[12] We next discuss the considerations which have led us to our conclusion.

### *Equal Protection Analysis*

As previously indicated, section 1731.5 is a statute which classifies the members of an identifiable group of individuals into two smaller groupings only one of which may be subject to commitment to the Youth Authority. We have in a number of past decisions described and applied the test most frequently employed by the United States Supreme Court in reviewing legislative classifications under the equal protection clause. " 'In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]

" 'On the other hand, in cases involving "suspect classifications" or touching on "fundamental interests," [fns. omitted] the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d

---

[11]We are not confronted by a situation in which a juvenile adjudged *under the Juvenile Court Law as a juvenile* contends that his term of involuntary confinement may exceed that which might have been imposed on an adult or juvenile who committed the identical unlawful act and was thereafter convicted *in the criminal courts.* Since that situation is not before us, we reserve consideration of the issue should it arise in some future case and we express no opinion on the merits of such a contention.

[12]As we base our conclusion that defendant is entitled to relief on equal protection grounds, we do not address his additional contention that the challenged sentencing scheme violates the cruel and unusual punishment clauses of the California and United States Constitutions. (See, however, *In re Gary W., supra,* 5 Cal.3d 296, 301-302.)

1241, 41 A.L.R.3d 1187]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224]; *In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999].)

Thus, in order to assess properly defendant's equal protection claim we must first make several preliminary determinations. We begin by noting that defendant does not contend that any "suspect classification" is involved in the sentencing scheme authorized by section 1731.5.[13] Instead, his argument is framed in "fundamental interest" form. Consequently, we must initially define just what "interest" is involved in the present case. Once that determination is made we must next decide whether that "interest" is "fundamental" for purposes of equal protection analysis. We must finally apply the appropriate standard of review to the legislative classification to see if it passes constitutional muster.

The United States Supreme Court has recently had occasion in *Breed* v. *Jones* (1975) 421 U.S. 519 [44 L.Ed.2d 346, 95 S.Ct. 1779], to consider the interest involved in a juvenile court commitment to the California Youth Authority. The language of Chief Justice Burger in that case is equally apposite to the case-at-hand. "[F]or purposes of the privilege against self-incrimination, 'commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." ' [Citation.]" (*Id.,* at p. 530 [44 L.Ed.2d at p. 356].) "Nor does the fact 'that the purpose of the commitment is rehabilitative and not punitive . . . change its nature. . . . Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action taken. Incarceration of adults is also intended to produce rehabilitation.' *Fain* v. *Duff* [(1973)] 488 F.2d at 225. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime 8-9 (1967)." (*Id.,* at p. 530, fn. 12 [44 L.Ed.2d at p. 356].)

Commitment in an institution of the Youth Authority can be described in many ways and can encompass a wide range of controls. However, the key factor common to all such descriptions is the physical restraint of the ward's person. While wards confined in institutions of the Youth Authority may often experience greater freedom within the

[13]We are not unaware that some commentators have suggested that age may constitute a "suspect classification." In the instant case no such claim has been presented.

institution than individuals confined in state prisons or mental hospitals (see *People* v. *Burnick* (1975) 14 Cal.3d 306, 319-320 [121 Cal.Rptr. 488, 535 P.2d 352]), they are nevertheless incarcerated against their will, a most basic form of personal liberty deprivation. The extent of defendant's interest is not, however, limited to that of freedom from the restraint which accompanies involuntary confinement in an institution. Wards of the Youth Authority released on parole although not incarcerated in an institution still remain subject to a number of significant restraints on their freedom. In addition to any special conditions which may be imposed, Youth Authority conditions of parole typically embrace the duty to follow all instructions of a parole agent including mandatory involvement in a selected employment, education or training program, submission to medical or psychiatric examinations or treatment as directed by the Youth Authority and the necessity of obtaining permission in order to change residences. (Youth Authority Board Policy Manual, Appendix F., Conditions of Parole.) Moreover, the parolee must acknowledge that he is still under the control of the authority and that violations of parole conditions may result in temporary detention for up to 30 days or return to an authority institution for the remainder of the commitment period. (*Id.*, §§ 1177, 1767.3.)

Thus, although the restraints on a parolee do not constitute as serious a deprivation of liberty as incarceration in an institution, they amount to a considerable limitation on the freedom of action which all other citizens possess. (Cf. *Jones* v. *Cunningham* (1963) 371 U.S. 236, 239-240 [9 L.Ed.2d 285, 288-289, 83 S.Ct. 373, 92 A.L.R.2d 675]; *In re Smiley* (1967) 66 Cal.2d 606, 612-613 [58 Cal.Rptr. 579, 427 P.2d 179].) We conclude therefore that defendant's interest must be defined to include not only his interest in being free from incarceration in an institution of the Youth Authority, but also to encompass his interest in freedom from the restraints that accompany parole or any other control by the authority. For the sake of simplicity we shall hereinafter refer to any of such interests as defendant's "personal liberty interest."[14] Having thus described the extent of the interest involved in our evaluation, we next address the question of whether that interest is fundamental for purpose of equal protection analysis.

To date the United States Supreme Court has denominated a number of interests as fundamental for purposes of applying the Fourteenth

---

[14]See generally Shattuck, *The True Meaning of the Term "Liberty" in Those Clauses in the Federal and State Constitutions which Protect "Life, Liberty, and Property"* (1891) 4 Harv.L.Rev. 365, 373, 377.

Amendment, including voting (*Reynolds* v. *Sims* (1964) 377 U.S. 533, 561-562 [12 L.Ed.2d 506, 526-528, 84 S.Ct. 1362]; *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]), travel (*Shapiro* v. *Thompson* (1969) 394 U.S. 618, 629-631 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322]), and personal privacy (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 482-486 [14 L.Ed.2d 510, 513-516, 85 S.Ct. 1678] [contraception]; *Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110] [procreation]; *Roe* v. *Wade* (1973) 410 U.S. 113, 152-154 [35 L.Ed.2d 147, 176-178, 93 S.Ct. 705] [abortion]).

In addition to those determinations, this court has enumerated interests which are fundamental under either the California or the United States Constitutions or both. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 604-610 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] [education]; *People* v. *Superior Court* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143] [unanimous jury verdict in criminal trial]; *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 720, 723 [94 Cal.Rptr. 602, 484 P.2d 578] [holding public office].) When pursuing fundamental interest analysis of the United States Constitution we are, of course, bound by the determinations of the high court whether those determinations are precedent or subsequent to our analysis. For example, the United States Supreme Court subsequently disagreed with our evaluation of education as a fundamental interest under the federal charter. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 18, 33-39 [36 L.Ed.2d 16, 34, 42-47, 93 S.Ct. 1278]). ■ However, when defining fundamental interests under the California Constitution, we exercise our inherent power as a court of last resort independent of fundamental interest determinations which may be reached by the United States Supreme Court solely on interpretations of the federal Constitution. (Compare *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 604-610, with *San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1, 33-39; cf. *Dept. of Mental Hygiene* v. *Kirchner* (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361]; *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753]; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 114-115 [127 Cal.Rptr. 360, 545 P.2d 272].)

We note initially that the answer to the question of whether personal liberty is a fundamental interest may seem obvious. However, the same question has been addressed by several other courts with conflicting

results. In *United States* v. *York* (D.Conn. 1968) 281 F.Supp. 8, the court concluded that a state sentencing scheme violated the equal protection clause of the Fourteenth Amendment because it permitted adult women to be incarcerated for periods in excess of the maximums applicable to men convicted of the same crimes. In making that determination the court also held that "[a]mong the rights protected by the Constitution, next to life itself, none is more basic than liberty" (*id.,* at p. 16), and accordingly applied the strict scrutiny test. Similarly, the court in *Bolling* v. *Manson* (D.Conn. .1972) 345 F.Supp. 48, 51, citing *York,* concluded that the imposition of lengthier custody and supervision on the plaintiffs' class impinged directly on personal liberty, "one of the most fundamental rights of the individual." Nevertheless, when another court was confronted with a similar claim, it refused to find that liberty was a fundamental interest. (*Sero* v. *Oswald* (S.D.N.Y. 1972) 351 F.Supp. 522, affd. and remanded *sub nom. United States* ex rel. *Sero* v. *Preiser* (2d Cir. 1974) 506 F.2d 1115, cert. den. (1975) 421 U.S. 921 [43 L.Ed.2d 789, 95 S.Ct. 1587].) Despite acknowledgment of the *Bolling* decision the *Sero* court felt constrained by its reading of several United States Supreme Court cases[15] to hold that the plaintiffs' "liberty interest" was not so

---

[15]The court held that *Baxstrom* v. *Herold* (1966) 383 U.S. 107, 111 [15 L.Ed.2d 620, 623-624, 86 S.Ct. 760], and *Johnson* v. *Louisiana* (1972) 406 U.S. 356, 363 [32 L.Ed.2d 152, 160, 92 S.Ct. 1620], both involved deprivations of liberty. Since the rational basis test was applied by the Supreme Court in those cases, the *Sero* court reasoned by negative implication that liberty was not a fundamental interest. Furthermore, the *Sero* court also indicated that the Supreme Court had noted probable jurisdiction in *Royster* v. *McGinnis* (S.D.N.Y. 1971) 332 F.Supp. 973 (a case written by Judge Lasker, author of the *Sero* opinion), in which the three-judge district court had framed an equal protection challenge to a deprivation of "good time" credit to inmates solely in terms of a rational basis test. Appraisal of the subsequent Supreme Court decision, *McGinnis* v. *Royster* (1973) 410 U.S. 263 [35 L.Ed.2d 282, 93 S.Ct. 1055], indicates that it can be read as supportive of the *Sero* interpretation of *Baxstrom* and *Johnson.* However, we find that interpretation unpersuasive for several reasons.

First of all, the question of liberty as a fundamental interest was never raised nor addressed in any of those decisions. Secondly, each of those decisions can be explained on other grounds. In *Baxstrom* the state had argued that persons found criminally insane were in a different class from those found civilly insane. Since the state could not support this contention on even a rational basis there was no need to consider a higher standard of review. *Johnson* dealt with the question of jury unanimity. Although the court held that the Fourteenth Amendment does not impose such a requirement on the states, it did not denigrate the fundamental importance of personal liberty. The court merely concluded that the procedures involved in depriving individuals of their personal liberty need not include a unanimous jury verdict under the United States Constitution. Finally, *McGinnis* can be read as simply an application of the well known rule that persons differently situated need not be treated equally. The court based its determination in *McGinnis* on a finding that the good time credit was based on rehabilitative progress by inmates once within the state prison system. Since the state could not presume to rehabilitate persons clothed in the presumption of innocence, it was not necessary to grant good time credit to persons held in county jails prior to determination of their guilt.

fundamental as to require application of the strict scrutiny standard. (*Id.,* at p. 527, fn. 6.) Finally, in *Smith* v. *State* (Tex.Civ.App. 1969) 444 S.W.2d 941, 947, the court summarily concluded that the possibility of longer confinement for juvenile commitments though an impingement on fundamental personal liberties did not call for strict scrutiny because of the traditional deference given legislative classifications of offenses and offenders for sentencing purposes.[16] (Cf. *State* v. *Sargent* (Me. 1973) 305 A.2d 273, 276, fn. 1.) With this background in mind we proceed with our own evaluation.

The origins of the personal liberty concept under consideration today and encompassed within the Fourteenth Amendment to the United States Constitution and article I, section 7, of the California Constitution can be traced as far back in Anglo-American legal history as the Magna Carta. (See 1 Schwartz, The Bill of Rights: A Documentary History (1971) pp. 6-7; Shattuck, *The True Meaning of the Term "Liberty" in Those Clauses in the Federal and State Constitutions which Protect "Life, Liberty, and Property," supra,* 4 Harv.L.Rev. at pp. 369-374.) The declaration of certain basic rights within one short chapter of that instrument has come to be viewed as the foundation for the protections guaranteed the defendant in our system of criminal justice.[17] Without a doubt, chapter 39 of the Great Charter implicitly recognizes the overwhelming importance and value attached to the concept of personal liberty by those who secured its guarantees at Runnymede. This same concern and respect for the concept of personal liberty is embodied in our concept of due process and has found repeated expression in both this court and the United States Supreme Court.

For example, in *Speiser* v. *Randall* (1958) 357 U.S. 513 [2 L.Ed.2d 1460, 78 S.Ct. 1332], the Supreme Court stated, "There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party

---

In contrast, the present case deals with a group of persons similarly situated, i.e., all convicted of a public offense.

[16]The court did, however, recognize *Commonwealth* v. *Daniel* (1968) 430 Pa. 642 [243 A.2d 400], as authority contrary to its own conclusion. *Daniel* overturned longer terms for women as lacking reasonable justification.

[17]Chapter 39 provides: "No free man shall be captured or imprisoned or desseised or outlawed or exiled or in any way destroyed, nor will we go against him or send against him, except by the lawful judgment of his peers or by the law of the land." (1 Schwartz, The·Bill of Rights: A Documentary History, *supra,* at p. 12.)

the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt." (*Id.,* at pp. 525-526 [2 L.Ed.2d at pp. 1472-1473]; *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].)

Moreover, if we look to the specific guarantees of due process secured by the Fourteenth Amendment, we find they exist largely because of the great concern our system of justice exhibits for procedures which can result in deprivations of personal liberty. The development of a criminal defendant's right to a speedy public trial by an impartial jury is one expression of fundamental respect for the concept of personal liberty.[18] In a landmark decision, the Supreme Court observed that "[t]he guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. . . . [T]he jury trial provisions . . . reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or group of judges." (*Duncan* v. *Louisiana, supra,* 391 U.S. 145, 155-156 [20 L.Ed.2d 491, 499-500], fns. omitted.)

Other basic guarantees of a fair trial secured by the Fourteenth Amendment include the right to counsel (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R. 733], confrontation of one's accusers (*Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]; *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074]), and notice of the charges (*In re Oliver, supra,* 333 U.S. 257). Each of these basic rights is more than a mere procedural nicety, for they implicitly recognize the fundamental importance of personal liberty. Nor do the foregoing specific guarantees of due process exhaust

---

[18]See *Klopfer* v. *North Carolina* (1967) 386 U.S. 213 [18 L.Ed.2d 1, 87 S.Ct. 988] (right to speedy trial); *In re Oliver* (1948) 333 U.S. 257 [92 L.Ed. 682, 68 S.Ct. 499] (right to public trial); *Turner* v. *Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546] (right to impartial jury); *Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444] (right to trial by jury).

the requirements of fairness. Due process requires that a criminal trial proceed with that fundamental fairness which has been found essential to the concept of justice. (*Lisenba* v. *California* (1941) 314 U.S. 219, 236 [86 L.Ed. 166, 179-180, 62 S.Ct. 280]; see *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623]; cf. *Estes* v. *Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 382 [66 Cal.Rptr. 724, 438 P.2d 372].) Thus, due process "cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through deliberate deception of court and jury . . . ." (*Mooney* v. *Holohan* (1935) 294 U.S. 103, 112 [79 L.Ed. 791, 794, 55 S.Ct. 340, 98 A.L.R. 406].)

Our observations and conclusions in regard to the relationship between the mandates of due process and the fundamental importance of personal liberty find support in our own recent decisions. We have held that trial by jury with proof beyond a reasonable doubt is a requirement of due process when the state attempts to deprive an individual of his liberty on the ground that he is a mentally disordered sex offender. (*People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352]; *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373].) In so doing we concluded that the right to a jury trial was no less fundamental an interest than voting or education " 'in an action which may lead to the involuntary confinement of the defendant, even if such confinement is for the purpose of treatment . . . .' " (*Feagley*, at p. 356; *In re Gary W., supra,* 5 Cal.3d 296, 306.) We further concluded that such procedures included the right to a unanimous jury verdict (*id.,* at pp. 347-352; see *People* v. *Superior Court, supra,* 67 Cal.2d 929, 932) and pointed out that the unanimous jury verdict requirement was mandated not by the due process clause of the Fourteenth Amendment but rather was grounded in article I, section 16, of the California Constitution. (*Id.,* at p. 350, fn. 10; compare with *Johnson* v. *Louisiana, supra,* 406 U.S. 356; *Apodaca* v. *Oregon* (1972) 406 U.S. 404 [32 L.Ed.2d 184, 92 S.Ct. 1628].) The fact that the California Constitution requires a unanimous jury verdict manifests an even stronger concern for unwarranted deprivations of personal liberty by the state than can be found in the due process clause of the Fourteenth Amendment, itself a strong protection against unwarranted deprivations of liberty.

No reason has been suggested, nor can we conceive of any, why the concern for personal liberty implicit in both the California and federal

Constitutions is any less compelling in defendant's case. We believe that those charters are no less vigilant in protecting against continuing deprivations of liberty than are their due process clauses in protecting against the initial deprivation of that liberty. We conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions.

█ As we have previously indicated, when reviewing legislative classifications under the equal protection clauses of the California and United States Constitutions, the legislation under examination is generally clothed in a presumption of constitutionality. However, once it is determined that the classification scheme affects a fundamental interest or right the burden shifts; thereafter *the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose. (E.g., *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 597; *In re Antazo, supra,* 3 Cal.3d 100, 110-111; *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 784-785; compare *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10].) █ Having determined that personal liberty is an interest which is entitled to the same protection as other fundamental interests, we confront the central issue before us: can the challenged sentencing scheme withstand application of the strict scrutiny standard? The People do not attempt to directly answer this crucial question but do suggest that the present sentencing scheme is designed to serve the state's interest in the treatment and rehabilitation of youthful offenders.[19] As authority for that proposition, we are referred to *In re Herrera, supra,* 23 Cal.2d 206, wherein this court observed, "The great value in the treatment of youthful offenders lies in its timeliness in striking at the roots of recidivism. Reaching the offender during his formative years, it can be an impressive bulwark against the confirmed criminality that defies rehabilitation, for it is characteristic of youth to be responsive to good influence as it is susceptible to bad." (*Id.,* at p. 213.)

There remains as much wisdom in that observation today as it held over 30 years ago. However, we are no longer able to find such a

---

[19]We note that the People's argument refers to "a legitimate purpose in placing minors in a class separate from adults." As we have previously pointed out, many, and most probably the overwhelming majority, of the persons committed pursuant to section 1731.5 are *already adults.* And, the reason that certain juveniles may be so committed is because they have been treated *as adults* for the express purpose of *convicting* them of a public offense. Needless to say, the People's rationale is not only inaccurate, it is also inadequate.

generalization, standing alone, as sufficient justification for governmentally imposed inequality where deprivations of personal liberty are involved. It is not without significance that *Herrera* was decided long before fundamental interest analysis and the strict scrutiny standard became fully delineated tools for use in constitutional evaluation. The analysis undertaken in *Herrera* was much different from that we engage in today for in 1943 it was sufficient to state, "It is a matter of practical necessity, . . . and one of legislative discretion, to fix theoretical lines where there are no real ones, and there is no abuse of such discretion when the theoretical lines are not unreasonable." (*In re Herrera, supra,* 23 Cal.2d 206, at p. 213.) While the malleability of youth noted in *Herrera* may have remained fairly constant through the intervening years, constitutional analysis has undergone considerable metamorphosis. Where once merely reasonable classifications were sufficient, the state must now show a compelling interest if fundamental rights are affected as in the present case. It was for precisely that reason that we have chosen to reconsider the conclusion reached in *Herrera,* notwithstanding the assertion of the People that defendant's position is "clearly without merit."

The People next urge that various federal courts have uniformly rejected equal protection challenges to the Federal Youth Corrections Act (18 U.S.C. § 5005 et seq.) which authorizes incarceration of young adult misdemeanants between the ages of 18 and 22 for periods of up to 6 years (18 U.S.C. §§ 5010, 5017) as compared with 1 year maximum jail terms for older adults convicted of the same offenses. (E.g., *Cunningham* v. *United States* (5th Cir. 1958) 256 F.2d 467; *Carter* v. *United States* (D.C.Cir. 1962) 306 F.2d 283 [113 App.D.C. 123]; *Standley* v. *United States* (9th Cir. 1963) 318 F.2d 700, 717; *Rogers* v. *United States* (10th Cir. 1963) 326 F.2d 56; *Kotz* v. *United States* (8th Cir. 1965) 353 F.2d 312; *Guidry* v. *United States* (E.D.La. 1970) 317 F.Supp. 1110, affd. (5th Cir. 1970) 433 F.2d 968.) We have reviewed this line of cases and are not persuaded thereby.

In *Cunningham* the defendant did not even raise an equal protection claim, although the court proceeded to deal with the issue in summary fashion. (*Id.,* at p. 473.) It relied on three earlier decisions all upholding similar classification schemes. (*Minnesota* v. *Probate Court* (1940) 309 U.S. 270 [84 L.Ed. 744, 60 S.Ct. 523, 126 A.L.R. 530]; *In re Herrera, supra,* 23 Cal.2d 206; *Ex parte Liddell* (1892) 93 Cal. 633 [29 P. 251].) Reading those cases for the proposition that only a reasonable classifica-

tion was required, the *Cunningham* court held the act did not conflict with equal protection guarantees. Our analysis of *Herrera* has already indicated that use of the reasonableness standard is that decision's major constitutional infirmity and we note the same flaw present in *Minnesota* and *Liddell.* On this point, then, *Cunningham* does little to aid the People's position.

In *Carter* v. *United States, supra,* 306 F.2d 283, the federal act was directly challenged on equal protection grounds. Judge (now Chief Justice) Burger reaffirmed *Cunningham* and succinctly described the rationale for longer detention of youthful offenders, stating, ". . . the basic theory of that Act is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison. The reasoning of the *Cunningham* court is relevant in this connection. The court there noted that the Youth Corrections Act 'provides for and affords youthful offenders, . . . not heavier penalties and punishment than are imposed upon adult offenders, but the opportunity to escape from the physical and psychological shocks and traumas attendant upon serving an ordinary penal sentence while obtaining the benefits of corrective treatment, looking to rehabilitation and social redemption and restoration.' 256 F.2d at 472." (*Id.,* at p. 285.) This statement from *Carter* has been widely cited and is representative of the major justification used to uphold youthful offender acts against equal protection claims. However, when we attempt to square the quid pro quo rationale with fundamental interest analysis, we find it constitutionally inadequate. This is not a case in which the state imposes only a slight impingement on defendant's freedom of action such as the prohibition on the purchase and consumption of alcoholic beverages until he reaches 21 years of age. (Bus. & Prof. Code, § 25658.) Moreover, such an argument presupposes that defendant's interest in freedom from incarceration is a fungible commodity which can be casually traded, albeit involuntarily, like apples or oranges. A quid pro quo theory might plausibly be argued if we were considering, for example, a tradeoff between slightly different conditions of probation or parole but it is grossly inappropriate when we deal with as fundamental a deprivation of liberty as incarceration. Irrespective of whatever amenities are provided to the ward confined in an institution of the Youth Authority in order to differentiate the quality of his incarceration from those persons confined in a county jail or state prison, the plain and simple fact remains that he cannot leave of his own free will. His daily routine is regimented, his

personal habits and intimate private matters are subject to the scrutiny of others; in short, his life is completely controlled in a most basic sense.

Few, if any, of the federal decisions following *Cunningham* and *Carter* have undertaken to reanalyze the conclusions reached in those cases. Each time the equal protection claim was urged by a youthful appellant it was met with a summary rejection and multiple citations to the earlier decisions. As we conclude that the premise underlying those cases is no longer constitutionally adequate we are no longer persuaded to follow their conclusions.

In contrast to the People's position we note that the American Law Institute (A.L.I.), which composed the Model Youth Correction Authority Act in the 1950's, has reversed its position on the issue of longer confinement for youthful offenders. During the formulation of the Model Penal Code, the A.L.I. indicated that "[it] departs from the Model [Youth Correction Authority] Act and the California legislation which permitted the Authority to control misdemeanants for a longer period than the ordinary maximum for their offenses (while Minnesota limits control to the maximum otherwise provided by law)." (Model Pen. Code, § 6.05, com. (Tent. Draft No. 7, May 3, 1957).) The reason for this change of attitude is particularly relevant to our own determination. "We recognize the theory of provisions of this kind [permitting longer confinement of youthful offenders], that such a longer term is more reformative than a short, definite sentence to jail. This is a case, however, where we think that theory has outrun a sense of just proportion. Simple regard for personal liberty—of young no less than of mature adults—requires, in our view that younger people not be subject to more onerous sentences because of their immaturity. We can perceive no adequate basis for sentencing young adults, whose offenses reveal no substantial danger to the community, to sentences as long as those imposed for major crimes." (*Id.*; see Rubin, Law of Criminal Correction (2d ed. 1973) Youthful Offenders, ch. 12, § 10, pp. 511-512; Rubin, Disparity and Equality of Sentences (1966) 40 F.R.D. 55, 74-76.)

While this reasoning is persuasive it is not our function to substitute our own judgment for the preference already expressed by the Legislature simply because we have struck a different balance on the basis of the evidence before us. But our determination in the present case is not based on a choice between two equally proper alternatives; it is compelled by the mandates of equal protection and preservation of a

fundamental interest. It is for that reason that we agree with the A.L.I. view heretofore expressed.

Even though we agree that the state has an interest in the rehabilitation of youthful offenders we have not been shown how this sentencing scheme is necessary to further that interest. Assuming arguendo that rehabilitation is a compelling state interest, we cannot determine what minimum period of confinement is sufficient to achieve the state's goal of meaningful rehabilitation. What is to limit the Legislature from expanding the inequality permitted by section 1770 to allow rehabilitative detention of youthful offenders until they are 30 or 40 years old or for life? We have previously adhered to the proposition that the cruel and unusual punishment provisions of the California and United States Constitutions do not apply to Youth Authority commitments because they are solely for the purpose of rehabilitation and not punishment. (*In re Gary W., supra,* 5 Cal.3d 296, 301-302.) If the equal protection clause can be overridden by the necessity of some "minimum period of confinement for rehabilitation" which is longer than the appropriate misdemeanor jail term as is urged by the People, then what other constitutional provision would bar a statute permitting the lifelong confinement of marginally incorrigible misdemeanant shoplifters, for example, under the beneficent guise of rehabilitative treatment?[20]

Furthermore, we have not been told why the present period of confinement permitted under section 1770 is any more necessary than a shorter term. In the context of juveniles adjudged as delinquents and committed under the Federal Youth Corrections Act the United States Congress has recently revised custody limitations so that they are now within constitutional bounds. (18 U.S.C. § 5037(b).)[21] The new provi-

[20] We hasten to add that by positing such Orwellian possibilities we do not intend to suggest that our Legislature would ever enact such a scheme into law. Rather, we do so in order to show the flaw in the "minimum period of confinement for rehabilitation" justification that is urged in support of the present sentencing scheme.

[21] Despite the fact that Congress saw fit to redraft the juvenile custody provisions of the federal act, it failed to accord the same protection to young adults committed after suffering a criminal conviction. Thus while juveniles and older adults in the federal system may not now be incarcerated for periods in excess of the maximums set by law for the same offense, young adults and juveniles convicted of crimes are still subject to extended periods of confinement. This is but one more example of the legislative inequity imposed in the youthful offenders area of the law.

Section 5037(b) provides in relevant part: "Probation, [or] commitment . . . shall not extend beyond the juvenile's twenty-first birthday or the maximum term which could have been imposed upon an adult convicted of the same offense, whichever is *sooner* unless the juvenile has attained his nineteenth birthday at the time of disposition, in

sions now accord juveniles confined as delinquents (as opposed to misdemeanants) the constitutional protection we find required in the instant case. Since the purpose of the Federal Youth Corrections Act is to substitute rehabilitation for punishment in a manner similar to the California legislation, it cannot now be argued that youthful California misdemeanants *necessarily* require longer rehabilitative detention. There has been no showing made that youthful offenders *necessarily* require longer periods of confinement for rehabilitative purposes than older adults.

The People argue that a ward who successfully completes his term with the Youth Authority may have his conviction expunged thereby relieving him of the disabilities and disadvantages that may otherwise follow the misdemeanant throughout the remainder of his life. (§§ 1179, 1772; see *People* v. *Navarro* (1972) 7 Cal.3d 248, 271-278 [102 Cal.Rptr. 137, 497 P.2d 481].) We are told that this possibility supplies an incentive to the ward to reform his conduct during his prolonged confinement by the Youth Authority. Even if we assume that a ward will be so motivated, the possibility of expungement does not demonstrate the necessity of the present sentencing scheme. Expungement is also granted to persons who successfully complete probation (Pen. Code, § 1203.4) and those persons are not required to pay the price of longer confinement in exchange for the expungement benefit.[22]

Finally, the present sentencing scheme leads to anomalous results. Attorneys representing youthful misdemeanants are put to the Hobson's choice of deciding whether to argue that their clients are incorrigible and thus not amenable to Youth Authority treatment, or arguing in the alternative that their clients are susceptible to reformation and are thus good candidates for probation. If the attorney chooses to argue for probation on the ground that his client can reform his conduct, failure to gain probation means that he has subjected the client to the increased likelihood of a commitment to the Youth Authority where he could be

which case probation, [or] commitment . . . shall not exceed the lesser of two years or the maximum term which could have been imposed on an adult convicted of the same offense." (Italics added.)

[22]And, we see no reason why successful completion of a shorter term in the Youth Authority, based on the instant decision, should not also result in expungement. If the ward takes part in the rehabilitative programs of the authority and performs successfully, the incentive rationale is still implemented.

incarcerated for up to six or seven years. If instead the attorney argues that his client is incorrigible (an unlikely event) he may well be confined in the county jail for a less lengthy term of incarceration. However, incarceration in a county jail may involve greater intra-institutional restraints than are present in some Youth Authority institutions and the youthful offender will lose the benefit of the educational and other programs available to Youth Authority wards. Our decision today will end the need for the lawyer and his client to choose between these two onerous alternatives at the sentencing hearing.

Having considered the issue at length we conclude that operation of the challenged sentencing scheme and section 1770 may result, and in defendant's case has resulted, in a denial of equal protection under article I, section 7, of the California Constitution and the Fourteenth Amendment to the United States Constitution, which denial has not been justified by a showing that it is necessary to achieve a compelling state interest. We hold that section 1770 is unconstitutional insofar as it authorizes the Youth Authority to maintain control over misdemeanants committed to its care for any period of time in excess of the maximum jail term permitted by statute for the offense or offenses committed. To the extent that *In re Herrera, supra,* 23 Cal.2d 206, and *People v. Scherbing, supra,* 93 Cal.App.2d 736, hold to the contrary they are hereby disapproved.

By our holding we do not intend to denigrate the efforts of those who have sought to change the rehabilitative ideal into reality. The California Youth Authority is a national leader in the continuing attempt to develop procedures which will enable youthful offenders to restore themselves to a meaningful place in society. Nevertheless, we cannot constitutionally condone the imposition of unequal terms of incarceration on youthful misdemeanants even if for purposes of rehabilitative efforts by the authority.

█ There remains the question of the proper disposition in defendant's case. Since the maximum period of incarceration which could have initially been imposed by the sentencing court (six months) has already expired, defendant must be released from custody if not otherwise under lawful restraint. The judgment is modified to provide that defendant's commitment to the Youth Authority be terminated

upon the finality of this decision. As so modified the judgment is affirmed.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

Respondent's petition for a rehearing was denied September 7, 1976. Clark, J., was of the opinion that the petition should be granted.