[ Civ. No. 20129. Fourth Dist., Div. Two. Jan. 17, 1979.]

In re HARM R., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
HARM R., Defendant and Appellant.

**COUNSEL**

Malcolm S. MacMillan, Public Defender, and Patra Wollum, Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Keith I. Motley, Alan S. Meth and Patricia D. Benke, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GARDNER, P. J.**—In this case we again wrestle with the constant and increasingly troublesome problem of retaining the informal rehabilitative features of the juvenile court and at the same time affording the juvenile the basic rights afforded adults charged with crime. In *In re Ronald S.,* 69 Cal.App.3d 866 [138 Cal.Rptr. 387], we discussed in broad terms the basic

conflict between those who believe entirely in the *parens patriae* concept of the juvenile court and those who advocate full constitutional rights for minors. We need not repeat that discussion but merely note that the instant case is one more example of that apparently insoluble problem.

## THE FACTS

In 1976, the minor admitted the allegations in a petition filed in the juvenile court under Welfare and Institutions Code section 602,[1] alleging a curfew violation and a violation of Penal Code section 602.5 (trespassing). He was made a ward of the juvenile court and thereafter was placed in a series of private, open institutions—the Williams Group Home, the Neil Howard Home, the Ettie Lee Group Home, Dahmer's Ranch, and California Boys Republic (three times). He promptly ran away from each. On one occasion, he only stayed 15 minutes. However, during the 3-year period covering these placements, he spent 191 days in these open facilities. He also spent 145 days in juvenile hall where he was detained between runaways.

In 1978, a supplemental petition was filed which alleged that he had run away from his third placement at Boys Republic. Apparently the juvenile court judge gave up on any placement program because he was simply continued as a ward of the juvenile court and released to his mother on condition he stay there. ■ He has now appealed, alleging that the juvenile court has lost jurisdiction over him since he has spent more time in custody than the maximum term of imprisonment for an adult charged with his original violation, i.e., 180 days for violation of Penal Code section 602.5.

## MINOR'S PLACEMENTS UNDER SECTION 727

Section 726 provides that under a section 602 wardship the minor may not be held in *physical confinement* for a period in excess of the maximum term of imprisonment which could be imposed on an adult committed for the same offense. *Physical confinement* is defined as placement in a juvenile hall, ranch, camp, forestry camp, secure juvenile home or any institution operated by the Youth Authority. Obviously, under the plain language of the statute, if minor's placement had been in any of the above, his position would be well taken. (We will discuss the juvenile hall detention separately.) However, minor's placements were not in any of the above; his placements were all under section 727, subdivision (1)(b)

---

[1] Hereafter, all citations are to the Welfare and Institutions Code unless expressly noted.

which provides for placement with "Some association, society or corporation embracing within its objects the purpose of caring for such minors. . . ." Section 207 provides that the institutions described in section 727 are to be nonsecure institutions.

At this point it should be noted that section 727 by its language provides for placement of dependent children (§ 300) and status offenders (§ 601) and provides, generally, for foster home or foster institution placement for these categories of youngsters. Section 602 is not mentioned in section 727. However, section 730 provides for placement for a 602 ward under section 727 in addition to commitment to a juvenile home, ranch, camp or forestry camp. (§ 327 also provides for CYA commitment for a § 602 ward.) Thus, while section 727 placements are basically those for dependent children or status offenders, these placements are available as an alternative to the more restrictive placements available for section 602 cases.

Had the minor come within the jurisdiction of the juvenile court under section 300 (dependent children) or section 601 (status offenders), it is clear that section 726 would not apply. Not only does the statute not apply, common sense tells us that any effort to bring these placements under section 726 must fail because there is simply no "maximum term" in an adult court for dependent children or status offenders. These categories do not exist insofar as an adult is concerned.

Thus, the question posed is whether a minor who originally came within the jurisdiction of the juvenile court under section 602 but whose treatment program was that of a dependent child or a status offender under section 727 is entitled to the benefit of section 726. The language of that statute indicates that he is not. Under the plain language of section 726, the minor did not suffer "physical confinement" during his commitments under section 727. So much for the statutes.

## EQUAL PROTECTION

■ However, minor has fitted another arrow into his bow. He now contends that he is being denied equal protection of the law since he was actually "in custody" for the maximum allowable number of days regardless of the code section under which he arrived at those various places. With refreshing candor, minor stakes out his legal position in black and white terms. He contends that even if these had been foster home placements, i.e., one child with one family, thus leaving out the

institutional aspect of his placements, the juvenile court would lose jurisdiction over him six months after his placement in a foster home. To the minor any placement outside of the home in a situation in which a warrant might be issued for his arrest should he leave that placement triggers his equal protection contention. We appreciate this candor because it puts the issue in proper perspective and allows no hair-splitting refinements or judicial sophistry. There can be no weaseling on this issue when it is presented on this basis.

We agree with the minor that a proper analysis calls for the application of the strict scrutiny test. Minor was not at home. He was placed by court order in facilities away from his home. To that extent, there was a "physical restraint" of his person. Therefore, we will apply the strict scrutiny test of *People* v. *Olivas,* 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]. We are dealing with a personal liberty interest. Thus, the test is whether there is a compelling state interest which will justify the distinction between open placements under section 727 and the "physical confinement" involved in a placement in a juvenile home, ranch, camp, foster home, secured juvenile home or the CYA. The second part of the test is whether this distinction is necessary to fill the purposes of the Juvenile Court Law. We find that there is a compelling interest which justifies the distinction made in the law and that that distinction is necessary to facilitate the purposes of the Juvenile Court Law. Considering the basic philosophy of the Juvenile Court Law, or what is left of that philosophy, we find the instant distinction valid.

The statutory scheme for the treatment of minors in the juvenile court operates on a sliding scale. The most onerous treatment is commitment to CYA (§ 731). This is reserved for section 602 cases and may be resorted to only when no other program appears appropriate. (§ 734; *In re Aline D.,* 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65].) Next on the scale is commitment to a county institution—a juvenile home, ranch, camp, foster home or juvenile hall (§ 730). The least restrictive placement is under section 727 which provides basically for nonsecure foster home or private foster home institution placement.

We would be less than candid if we did not admit that physically some of the placements under sections 727 and 730 are very similar. Many counties operate ranches and homes which are as open placements as those to which the minor was committed in this case. (Examples are the Joplin Ranch in Orange County and Twin Pines Ranch in Riverside County.) However, we do not feel that the physical resemblances are

controlling. In theory at least, commitments under section 727 are to private foster homes either in single or group settings. Commitments under section 730 are to governmentally operated institutions which, theoretically at least, may be locked institutions although, as we have indicated, many are operated as completely open institutions.

Rather the distinction is that which exists between the categories of minors committed. Only section 602 wards can be committed to a county institution (§ 730) or the Youth Authority (§ 731). Dependent children (§ 300) and status offenders (§ 601) may not. They may only be sent to homes or institutions described in section 727. Because they have committed no crime, they may be committed only to nonsecure, open, foster home placements. (§ 207; *In re Ronald S., supra,* 69 Cal.App.3d 866.) Thus, the Legislature has made a logical distinction, consistent with the purposes of the Juvenile Court Law, between commitments to private institutions and commitments to county- or state-operated institutions.

Admittedly, there is an overlap. Some minors, including this one, may receive the less restrictive commitments generally reserved for dependent children and status offenders if the juvenile court judge believes that such a treatment program would be beneficial. Thus, the youthful criminal offender receives the treatment prescribed for the dependent child or the status offender. This should not bring him under the umbrella of section 726.

Any other conclusion would have absurd results. A runaway who commits a petty theft and comes before the juvenile court on a section 602 finding could be kept in a foster home placement and have to stay only six months while a plain runaway who does not steal anything could be kept in that placement indefinitely. We decline to read into the statutory scheme any such absurd results. If a section 602 ward receives dependent child or status offender treatment, he suffers no constitutional impairment if his treatment program exceeds the maximum term available for the underlying criminal offense. There is a compelling state interest which distinguishes between section 727 placements and placements under section 730 (or 731).[2]

---

[2]Theoretically, of course, if minor had been placed in secure facilities under section 730, none of his current runaway history would have taken place. Thus, he would have been placed in a secure institution and at the end of six months would have been entitled to release. Of course, we must admit that this is a thin theory because, as we have pointed out, many counties operate open institutions and for all we know some CYA institutions may also operate some open institutions. Additionally, no one as yet has been able to design any kind of a juvenile facility from which a dedicated and fleet footed runaway cannot escape.

All in all, we find that there is a compelling state interest which justifies this distinction in placements. Until such time as we are to impose on the entire juvenile court system all the procedures prescribed in the adult criminal code, some distinctions between the juvenile court and the adult criminal court must exist. We find the current situation to come within that category.

### The Juvenile Hall Detention

■ As indicated, minor spent some 145 days in juvenile hall between placements. He wants credit for this time and we agree.

While the Juvenile Court Law has no statutory equivalent to the credit provisions of Penal Code section 2900.5, the requirements of that section have been applied to the maximum period of a Youth Authority commitment. (*People* v. *Sandoval,* 70 Cal.App.3d 73 [138 Cal.Rptr. 609].) However, *In re Leonard R.,* 76 Cal.App.3d 100 [142 Cal.Rptr. 632], held that this section may be applied only if the CYA commitment resulted from proceedings in adult court. *Leonard R.* held that the Legislature had not extended the concept of presentence commitment credits to the juvenile court system and that failure to do so had not resulted in any denial of equal protection of the laws. *In re Eric J.,* 86 Cal.App.3d 513 [150 Cal.Rptr. 299], declined to follow the reasoning of *In re Leonard R.* However, we need not become embroiled in any controversy between *Leonard R.* and *Eric J.* vis-à-vis the application of Penal Code section 2900.5 to the juvenile court.

Section 726 provides that when a minor is removed from the custody of his parents as the result of an order of wardship made pursuant to section 602 (the instant case), a minor may not be held in a physical confinement for longer than the underlying crime and physical confinement expressly includes juvenile hall. Thus, the 145 days in juvenile hall must be credited against the total time the minor may be held within the jurisdiction of the juvenile court. Thus while the juvenile court has not lost jurisdiction of the minor, he may not be committed to a juvenile hall, home, ranch, camp, foster camp or the CYA for longer than 35 days, i.e., 180 days minus 145 days.

The Attorney General argues that the commitments to juvenile hall are not related to the section 602 finding but to his continuous acts of running away. We do not agree. It was a section 602 finding which triggered the whole series of events.

It may seem inconsistent and even appear hypercritical that a minor who might be the subject of a section 300 or section 601 finding can receive a potentially longer period of confinement under section 727 or even in juvenile hall between placements than does a youngster who comes before the juvenile court because he has committed a crime. However, this is the somewhat illogical result of the war between two philosophies which is presently busily engaged in tearing the juvenile court to pieces. Dependent children and status offenders have no corresponding category in the adult criminal court. They come under "pure" juvenile court concepts. On the other hand, the section 602 ward comes to the juvenile court not necessarily because of any breakdown in the home or in the family in which the court must step in as a substitute parent but because he has committed an antisocial act which would be a crime were he an adult. Under elementary principles of equal protection, he must receive all of the rights an adult offender would receive except those which are completely inconsistent with the philosophy of the juvenile court, i.e., bail and a jury trial.

Judgment affirmed.

Kaufman, J., and Morris, J., concurred.

**GARDNER, P. J.**—I concur.

Long before *Gault* and even before the new Juvenile Court Law of 1961, I, as a thoroughly disillusioned judge of the juvenile court, made some suggestions which, had they been followed, would have avoided all of the legislative and judicial anguish of the last decade. My solution was simple, too simple to be palatable. I suggested that we divide the juvenile court into two courts. One court would handle dependent children exclusively and would operate on a pure, traditional *parens patriae* juvenile court concept dedicated to the protection of these unfortunate children who have come before the court through no fault of their own but because of tragic social conditions over which they have no control. With the exception of basic due process principles, this court could divorce itself entirely from the highly complex procedures of the adult criminal court. The other court would handle juvenile law violators and would operate as a criminal court affording the juvenile charged with a crime exactly the same rights as an adult charged with a crime. After the jurisdictional phase of the case, of course, the rehabilitative focus of the juvenile court would still exist. (I have always thought that we should

jettison the silly fiction that the juvenile court cannot consider punishment as a part of a rehabilitative program.) As to the status offender—the incorrigible—since the courts have been notoriously unsuccessful in this field and assuming that the state has some obligation to step into these purely family matters, I would take this category entirely from the court system and turn it over to another agency, another entity or another discipline. They could not possibly do a worse job than we in the courts have done up to the present time. (See: Gardner, *Gault in California* (1968) 19 Hastings L.J. 527; Gardner, *Juveniles Face the Worst of Both Worlds in Court*, Los. Angeles Times Opinion (Nov. 19, 1967) § G, p. 1; Gardner, *Kent and the Juvenile Court* (1966) 52 A.B.A. J. 923; Gardner, *The Juvenile Court, A Challenge to Lawyers* (1965) 40 State Bar J. 349; Gardner, *Let's Take Another Look at the Juvenile Court* (1964) 15 Juv. Court Judges J. 13; Gardner, *The Error of 1899* (1963) 32 FBI Law Enforcement Bull. 3.)

The petitions of both the parties for a hearing by the Supreme Court were denied March 14, 1979.