[Civ. No. 18282. Fourth Dist., Div. One. Aug. 1, 1979.]

In re ROBERT D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ROBERT D., Defendant and Appellant.

768

COUNSEL

Appellate Defenders, Inc., under appointment by the Court of Appeal, George C. Boisseau and Handy Horiye for Defendant and Appellant.

George Deukmejian, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Michael E. Lasater, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STANIFORTH, J.**—After a jurisdictional hearing, the juvenile court referee found 17-year-old Robert D. came within the provisions of Welfare and Institutions Code section 602 in that he had unlawfully driven another person's vehicle in violation of Vehicle Code section 10851. He ordered the minor removed from his home (Welf. & Inst. Code, § 726, subd. (b)). Thereafter the court committed Robert to the California Youth Authority (CYA) for the maximum term of three years. An application for rehearing was made to the judge of the juvenile court upon the grounds that the defense motion for suppression of evidence was improperly denied. The motion was denied. Robert appeals urging multiple error.

FACTS

Nancy Erman's Volkswagen was stolen from her home after midnight on April 15, 1978. Sgt. Ready, Carlsbad Police Department, saw the Volkswagen about 4:30 a.m. later that morning on Marron Road in Carlsbad. The Volkswagen was rounding a turn at approximately 50 to 55 miles per hour; the rear end of the vehicle swerved slightly. Ready activated his siren and pursued the Volkswagen. The chase continued

into the City of Oceanside where the Volkswagen increased its speed to approximately 70 miles per hour. After about a mile of high speed chase, the Volkswagen rounded a curve, crashed into a fence. Two individuals ran from the Volkswagen. Ready identified Robert as the driver. Another police officer joined the foot chase and captured Robert some 200 yards from the wrecked car. Ready testified that when he first observed the Volkswagen, he intended to stop it for speeding. The speed limit on Marron Road was 55 miles per hour.

## I

Robert's contention of lack of substantial evidence to support the true finding is based upon his assumption that the observations of Ready must be stricken. Without such observations, there is no substantial evidence to support the true findings because Ready's testimony identifying Robert as the driver of the stolen vehicle is critical.

Robert contends the observations of Ready were the product of an illegal detention. He points to *Badillo* v. *Superior Court,* 46 Cal.2d 269, 273 [294 P.2d 23], and *People* v. *Stewart,* 241 Cal.App.2d 509, 515 [50 Cal.Rptr. 630], for the rule that evidence obtained as a result of flight caused by a threat of illegal search is inadmissible. He relies upon this sound general premise: evidence which is the direct product of the exploitation of an unlawful investigative stop must be suppressed (*In re Tony C.,* 21 Cal.3d 888, 899 [148 Cal.Rptr. 366, 582 P.2d 957]) but argues therefrom an unsound corollary: that evidence obtained as a result of flight caused by a threat of illegal police detention should also be suppressed.

The juvenile court referee specifically found Ready had no lawful right to stop or detain Robert on the basis of the manner he drove the car around the first corner. But the referee quickly pointed out the numerous subsequent illegal acts by Robert, namely speeding, failure to yield to red light and swerving and, of course, the traffic accident—literally a hit and run offense. He concluded these delicts justified the apprehension and detention. Robert asserts Ready in activating his lights and siren was "detaining" him. However, Robert did not stop in response to the police action but rather fled and commenced his high speed exhibition and escape attempt.

■ Even though the eventual stop followed sequentially and was a proximate result of the unauthorized use of siren and red lights, yet the observations as to the driver of the car were properly admitted. It is a

fundamental rule that "there is no right to a flight from unlawful arrest." (*People* v. *Prendez*, 15 Cal.App.3d 486, 489 [93 Cal.Rptr. 180].) Just as an individual has no right to resist an unlawful arrest (Pen. Code, § 834a), Robert had no right to commit numerous additional unlawful acts in order to avoid that which may concededly in the first instance have been an unjustified attempt at detention.

The subsequent illegal acts dissipated any taint caused by the unauthorized police action in activating the red light and siren. They form a new, independent, lawful basis justifying Robert's apprehension and arrest. (*People* v. *Prendez, supra,* at p. 489; *People* v. *Donovan,* 272 Cal.App.2d 426, 433 [77 Cal.Rptr. 293].) *Badillo* v. *Superior Court, supra,* 46 Cal.2d 269, relied upon by Robert, offers him no aid, for there the later acts of Badillo did not give rise to an independent basis for apprehension. At the core of Robert's contention is the unsound premise that one impropriety by the police gives carte blanche to break the law. Such is not the law generally, nor the law of search and seizure specifically. The referee properly admitted the testimony of Ready, observations of Robert as the driver of the stolen car.

## II

■ Robert next challenges the procedure of approval of the referee's order removing him from his home. Welfare and Institutions Code section 249 requires a referee order removing a minor from his home be expressly approved by a juvenile court judge before it becomes effective. (*In re John H.,* 21 Cal.3d 18, 26 [145 Cal.Rptr. 357, 577 P.2d 177].) The statute says: "No order of a referee removing a minor from his home shall become effective until expressly approved by a judge of the juvenile court." Further, California Rules of Court, rule 1318(b), requires such approval to be made within two days of the order. Here, however, the order was approved three days after it was made by Presiding Judge Orfield of the San Diego Superior Court, acting under authority of Code of Civil Procedure section 635 which provides for the presiding judge of a court to sign a formal judgment or order when the judge who tried the matter is unavailable.

The procedure at bench comports with the requirements of law. First, Judge Orfield is a judge of the juvenile court as required by Welfare and Institutions Code section 249. (See San Diego Super. Ct. Rules of Court, div. 3, rule 1, § 1, [¶] 4: "All superior court judges of San Diego County

are judges of the juvenile court.") Next, the rule quoted above requiring approval within two judicial days does not, could not, specify the order becomes void if not approved within that period. This is a rule of procedure only; it is to give immediate effect to the referee's order, which is not effective until the juvenile court judge signs it. (See *In re John H., supra*, at p. 26.) Thus the one day's delay simply delays the effective date when Robert could lawfully be removed from his parents' home.

## III

Robert next argues he was improperly committed to the CYA because the record fails to show findings that the commitment to the CYA would be a probable benefit to Robert. ■ By statutory mandate, the juvenile court *must* find such commitment to be a probable benefit to the minor. (Welf. & Inst. Code, § 734.) However, the specific reasons for such commitment need not be stated in the record. Rather that determination must be supported by substantial evidence contained within the record. (See *In re John H., supra*, 21 Cal.3d at p. 27; *In re Aline D.*, 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65].) Here, Judge Orfield in committing Robert to the CYA made these specific findings: "The mental and physical condition and qualifications of this person are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the Youth Authority."

We are required to examine the record to determine if there is evidentiary support for this specific finding. The record before the judge included both the probation officer's social study of Robert and the observations of the referee. The social study showed that Robert had been committed *twice* before to Rancho Del Campo. These efforts failed to deter his criminal activity. As the juvenile court referee observed: "Well, Robert has had two stays at camp. He's 17 years old. He's building up a substantial prior record. Worst of all, he doesn't give a damn." And another quote: "I do not see any alternative, and I don't see any local facilities that could possibly rehabilitate him at this time." This record adequately supports the conclusion that the commitment to the CYA would probably benefit Robert.

## IV

■ Robert next contends he is entitled to 27 days' credit for preconviction time spent in custody in juvenile hall. We have examined

the reasoning in *In re Leonard R.,* 76 Cal.App.3d 100, 103-104 [142 Cal.Rptr. 632], and in *In re Harm R.,* 88 Cal.App.3d 438 [152 Cal.Rptr. 167], and are persuaded by the *Harm* reasoning. Therefore, the judgment here must be modified to give Robert credit for the 27 days for preconviction time spent in juvenile hall—presentence.

## V

■ Finally, Robert contends his commitment for the "maximum term" was improper. Robert has been adjudged, sentenced as a juvenile under juvenile court law. He therefore does not stand in the same posture as a juvenile or adult who has committed the identical unlawful act but who was thereafter convicted in the criminal courts. Therefore the case is not controlled by the decision in *People* v. *Olivas,* 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], where this precise question was expressly reserved "should it arise in some future case." (*Id.,* at p. 243, fn. 11.)

■ The first and minimal requirement of equal protection of the law is that persons similarly situated must receive like treatment under the law. (*In re Gary W.,* 5 Cal.3d 296, 303-304 [96 Cal.Rptr. 1, 486 P.2d 1201].) Robert, a minor, does not have all of the rights, protections, obligations, burdens, risk of jail or prison commitment as does an adult. He faces a juvenile justice system where rehabilitation is the announced legislative purpose. (Welf. & Inst. Code, § 202.) In contrast, the objective in adult incarceration is punishment. (Pen. Code, § 1170, subd. (a)(1); see, e.g., *In re Issac G.,* 93 Cal.App.3d 917 [156 Cal.Rptr. 123].)

Any parallel between the adult felon and the juvenile delinquent who have violated the same penal statute ends at the point of beginning of two separate, distinct punishment/rehabilitation statutory schemes. The commitment of the youth, processed through the juvenile court, to the Youth Authority for the maximum period under Welfare and Institutions Code section 731 is in no way the equivalent of the commitment of the adult to prison for the same crime for the upper term based upon aggravation factors.

When the juvenile is committed for the maximum period, he is in fact being committed for an indeterminate period. The adult sent to prison for the upper "term prescribed" will be confined for that specific period less any behavior-performance credits. (Pen. Code, §§ 2930-2931.) At the heart of the determinate sentence law is the concept of a fixed term.

In contrast, to the juvenile, the "maximum" term is simply the outside time limit for a statutory program aimed directly at rehabilitation. A youth committed to the CYA may be permitted his liberty, under supervision, under conditions "best designed for the protection of the public." (Welf. & Inst. Code, § 1766, subd. (a).) Thus the youth may be *immediately* released back to the community; thereafter he may be ordered reconfined, and again released under supervision, as often as conditions indicate to be desirable. (Welf. & Inst. Code, § 1766, subds. (c)-(f).)

In order to achieve its treatment, rehabilitative goal, the Youth Authority has wide latitude, broad discretionary powers in the treatment and discharge of persons committed to it, including instant status reexaminations. (Welf. & Inst. Code, § 1762; *In re Matter of Aaron N.*, 70 Cal.App.3d 931, 939 [139 Cal.Rptr. 258].)

While equal protection principles prohibit "physical confinement"[1] beyond the maximum period authorized for a similarly offending adult (Welf. & Inst. Code, § 731),[2] Welfare and Institutions Code section 726 provides "nothing in this section shall be construed to limit the power of the court to retain jurisdiction over a minor and to make appropriate orders pursuant to Section 727 for the period permitted by Section 607." Section 607 provides the juvenile court may retain jurisdiction over a ward "until such ward or dependent child attains the age of 21 years, except as provided in subdivision (b)." (Welf. & Inst. Code, § 607, subd. (a).) Subdivision (b) of the Welfare and Institutions Code section 607 provides: "The court may retain jurisdiction over any person who is found to be a person described in Section 602 of this code by reason of the violation, when he was 16 years of age or older, of any of the offenses listed in subdivision (b) of Section 707 until such person attains the age of 23 years if the person was committed to the Youth Authority."

---

[1]Welfare and Institutions Code section 726 defines "physical confinement" to mean "placement in a juvenile hall, ranch, camp, forestry camp or secure juvenile home pursuant to Section 730, or in any institution operated by the Youth Authority."

[2]In urgency legislation passed in 1977-1978, the Legislature amended section 731, again, reaffirming the clear statutory intent: "A minor committed to the Youth Authority may not be held in physical confinement for a period of time in excess of the maximum period of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court. Nothing in this section limits the power of the Youth Authority to retain the minor on parole status for the period permitted by Section 1769." (Stats. 1977, ch. 1238, § 2, p. 4159.)

Before enactment of the challenged amendments to sections '726 and 731 of the Welfare and Institutions Code, the period of Youth Authority *confinement* for minors processed through the juvenile court system was unspecified. However, discharge from the system itself generally occurred after two years or when the minor reached his 21st birthday, whichever occurred later. (Welf. & Inst. Code, § 1769, subd. (a).)

Section 1769, subdivision (b), authorizes discharge of specified committees at age 23 "unless an order for further detention has been made by the committing court pursuant to Article 6 (commencing with Section 1800.)" Section 1800, providing for extended detention of dangerous persons, was held constitutional against the charge of denial of equal protection in *In re Gary W., supra,* 5 Cal.3d 296, 304.

These legislative choices as to maximum length of detention, variable times for release within the maximum period must be viewed in the light of the powers and duties of the Youth Authority and the facilities available and authorized for use by them to fulfill the treatment, rehabilitative aim mandated by the Legislature. Such words and phrases as "hospitals," "camps," "schools," "training facilities," "study, treatment, diagnosis," "deposit" and "investment of ward funds," "schools for the mentally disturbed," "payment of wages to wards for work," "conservation work," stand out as beacons, legislative guideposts given to the Youth Authority as the means of rehabilitation. The Legislature has in fact created two distinct systems: one for adult criminals who are to be punished by a fixed period of incarceration and the other a totally separate system for juveniles who are to be rehabilitated by treatment in the Youth Authority. The differences between these two systems are specific concrete demonstrations of the underlying legislative determination that minors are inherently different from adults and therefore should be treated differently. (*In re Ricardo M.,* 52 Cal.App.3d 744, 748-749 [125 Cal.Rptr. 291]; *In re Issac G., supra,* 93 Cal.App.3d 917.)

The fundamental, the articulated purpose of the juvenile justice system in this state is the treatment and rehabilitation of youths. (Welf. & Inst. Code, §§ 1000, 1176.) Reason and common experience tell us the prime necessity to achieve this goal is a system as flexible as financial means and constitutional restraints allow. Not only the physical setting, but techniques used, must of necessity sharply differ from those used in the adult prison, but also time requirements necessary to effect rehabilitation by their very nature demand flexibility. Punishment can be meted out in precise time units but modification of behavior is not a task subject to

similar quantification. One youth may have "insight" when he hears the first door closed and locked behind him. Another may not perceive the error of his ways and adjust his behavior for months or years. Some never will.

■ The constitutional guaranty of equal protection of the law does not require uniform operation of the law with respect to persons or classes not in like circumstances. (*People* v. *Romo,* 14 Cal.3d 189, 196 [121 Cal.Rptr. 111, 534 P.2d 1015].) "The state may not, however, arbitrarily accord privileges to or impose disabilities upon one class unless some rational distinction between those included in and those excluded from the class exists." (*In re Gary W., supra,* 5 Cal.3d 296, 303.) Thus the state may "provide for differences so long as the result does not amount to a denial of due process or an 'invidious discrimination.' [Citation.]" (*Douglas* v. *California,* 372 U.S. 353, 356 [9 L.Ed.2d 811, 814, 83 S.Ct. 814].)

If we subject the differential sentencing here required to most strict scrutiny, rational distinctions, compelling state interests emerge. The youthful offender sent to CYA and the adult sentenced to prison have only one point in common—the crime committed. The fact of *youth,* in and of itself, mandates a differential approach. The whole concept of *equal* treatment for juvenile and adults is, has long been regarded as, barbarous. The very thought of an eight-year-old burglar receiving like treatment as an adult felon with similar record carries its own refutation. The distinctions made are not only rational but absolutely essential to avoid a charge of cruel and inhuman punishment.

A strict scrutiny of the distinctions made lead us to this further insight demonstrating the fallacy of the equal protection argument here made. It is the adult, not the juvenile, who, if the equal protection argument has any relevance, has cause for complaint. It is more often the adult "whose ox is gored." *In re Issac G., supra,* 93 Cal.App.3d 917, 920-921, makes this further incisive point against the use of "facile" equal protection arguments when comparing youth versus adult postconviction treatment: "The fallacy rests, we submit, on confusion between due process and equal protection. *In re Gault* . . . and its spawn did not hold, as so many of these cases seem to suggest, that what's sauce for the goose is necessarily sauce for the gosling, even if the sauce is not constitutionally compelled."

■ We conclude the imposition of the "maximum term" for care and treatment of Robert in the Youth Authority facility does not constitute a denial of "equal protection of the law." The statutory scheme and case authority not only justify but demand a differential treatment approach for youths. (*In re Issac G., supra,* 93 Cal.App.3d 917; *In re Ricky H.,* 2 Cal.3d 513, 520 [86 Cal.Rptr. 76, 468 P.2d 204]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.,* 12 Cal.3d 434, 439 [115 Cal.Rptr. 761, 525 P.2d 665]; *In re Aline D.,* 14 Cal.3d 557, 564-567 [121 Cal.Rptr. 816, 536 P.2d 65]; *In re Leonard R.,* 76 Cal.App.3d 100, 104-105 [142 Cal.Rptr. 632]; Welf. & Inst. Code, §§ 1000, 1700.)

The order of commitment herein is ordered modified to give Robert credit for 27 days spent in juvenile hall. In all other respects the order of commitment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 11, 1979.