Filed 5/18/15  In re Jake P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JAKE P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAKE P.,<br><br>Defendant and Appellant. | F069144<br><br>(Super. Ct. No. JJD065632)<br><br>**OPINION** |

-ooOoo-

# THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

[*]    Before Cornell, Acting P.J., Peña, J. and Smith, J.

Jake P. appeals from his commitment to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) for the maximum term allowable by law.[1]  We affirm.

## FACTS AND PROCEDURAL HISTORY

### *Prior Proceedings*

On August 16, 2011, the Tulare County District Attorney filed a juvenile wardship petition under section 602, alleging Jake committed second degree robbery (Pen. Code, § 211).  According to the probation officer's detention/intake assessment, Jake and two other subjects assaulted the victim and stole a pizza from him.  On October 3, 2011, Jake admitted the lesser offense of felony grand theft from the person.  (*Id.*, § 487, subd. (c).)  On October 17, 2011, Jake was declared a ward of the court and placed on probation on various terms and conditions.[2]

On January 20, 2012, the Tulare County Probation Department filed notice of a violation of probation (§ 777), alleging Jake failed to obey curfew, attend school regularly, not associate with gang members or associates or possess gang paraphernalia, and obey his mother.  That same day, the district attorney filed a second juvenile

---

[1]  Jake is sometimes referred to as Jacob in the record.  According to him and his mother, however, his first name is Jake.

DJJ is sometimes referred to as the Division of Juvenile Facilities.  (See, e.g., Welf. & Inst. Code, § 1710, subd. (a); further statutory references are to the Welfare and Institutions Code unless otherwise stated.)

[2]  The probation officer's report revealed Jake had a prior record of misdemeanor battery on a person and vandalism (Pen. Code, §§ 243.2, subd. (a), 594, subd. (a)), for which he was counseled and released; misdemeanor vandalism (*id*., § 594, subd. (a)), for which he was placed on informal probation that was dismissed unsatisfactorily; and misdemeanor vandalism/possession of a drill or other tool (*id*., § 594.2, subd. (a)), for which he was again placed on informal probation that was dismissed unsatisfactorily.  The report further revealed that while detained at the juvenile detention facility (JDF) on the current petition, Jake received a number of disciplinary referrals for things such as yelling a derogatory gang term at another minor, being disrespectful toward staff, tattooing himself, and being involved in a physical altercation.

wardship petition under section 602, alleging Jake resisted or obstructed a peace officer (Pen. Code, § 148, subd. (a)(1); count 1) and gave false information to a peace officer (*id*., § 148.9, subd. (a); count 2). According to the probation officer's detention/intake assessment, a plainclothes officer observed Jake out after curfew. Jake yelled gang slogans and "'threw signs'" at the officer, and fled when the officer approached and identified himself. When apprehended a short distance away, Jake gave the officer a false name. On February 14, 2012, the court found true the probation violations and count 2 of the petition. On March 1, 2012, Jake was continued as a ward of the court and placed on probation on various terms and conditions.[3]

On or about April 2, 2012, the probation officer filed a notice of violation of probation (§ 777), alleging Jake failed to obey curfew, not use or possess marijuana, attend school regularly, obey school rules, not possess gang paraphernalia, report to probation as directed, and obey his mother. On April 4, 2012, Jake admitted the allegations. On April 19, 2012, the court continued wardship and committed Jake to the Tulare County Youth Facility (a boot camp program) for 365 days.

On July 6, 2012, the district attorney filed a third wardship petition under section 602, alleging Jake committed battery (Pen. Code, § 242; counts 1, 3 & 5) and resisting or obstructing a peace officer (*id*., § 148, subd. (a)(1); counts 2, 4 & 6). According to the probation officer's detention/intake assessment and supplemental report, Jake was involved in a gang-related physical assault on another minor at the youth facility on three different occasions. On July 16, 2012, Jake admitted counts 1, 2, 5, and 6, and the remaining counts were dismissed. On July 30, 2012, the court continued wardship and

---

**3** The probation officer's report revealed that while detained at JDF on the present petition, Jake received a number of disciplinary referrals for such things as disobeying staff instructions, being disrespectful to staff, and being disruptive by kicking his door.

committed Jake to the Tulare County Youth Correctional Center Unit (YCCU) for 240 to 365 days.[4]

On August 7, 2013, the probation officer filed a notice of violation of probation (§ 777), alleging Jake (who completed the residential phase of YCCU on June 14, 2013) failed to abide by the Aftercare Program rules, failed to turn in his work at school, and left home without permission. On September 3, 2013, Jake admitted the allegations. On September 17, 2013, the court continued wardship, but placed Jake on electronic monitoring for 90 days and ordered him to obey various terms and conditions of probation.[5]

*Current Proceedings*

On October 2, 2013, the probation officer filed a notice of violation of probation (§ 777), alleging Jake failed to attend school regularly, abide by school rules, report to the probation officer as directed, and not use, possess, or be under the influence of alcohol or illegal substances. Jake was also alleged to have absconded from his residence, with his whereabouts being unknown. On November 22, 2013, the district attorney filed a fourth wardship petition under section 602, alleging Jake committed petty theft (Pen. Code, § 484, subd. (a)). On December 30, 2013, the district attorney filed a first amended petition, alleging Jake committed assault by means of force likely to produce great bodily injury, during the commission of which he personally inflicted great bodily injury (Pen. Code, §§ 245, subd. (a)(4), 12022.7, subd. (a); count 1), first degree burglary (*id*., § 459;

---

[4]     The probation officer's report related that while committed to the youth facility, Jake accumulated incident reports for being involved in mutual combat and participating in gang behavior, in addition to the incidents that gave rise to the petition.

[5]     The probation officer's report related that while detained on this occasion, Jake received a disciplinary referral for a single incident of singing gangster rap, using profanity, and not following directions. The report also related that during the residential phase at YCCU, Jake participated in all services and counseling as required, and completed Aggression Replacement Training, Montana Meth Project, and Alcohol and Drug Recovery Treatment.

count 2), animal cruelty in which he personally used a deadly weapon (*id*., §§ 597, subd. (a), 12022, subd. (b)(1); count 3), grand theft of a firearm (*id*., § 487, subd. (d)(2); counts 4 & 5), and petty theft (*id*., § 484, subd. (a); count 6). On February 26, 2014, Jake admitted counts 1 through 3. The enhancement allegations on counts 1 and 3, together with the remaining counts, were dismissed. The parties stipulated to a DJJ disposition.

The probation officer's report related that, according to records of the Visalia Police Department, J.P., an off-duty Tulare County sheriff's deputy, returned home around 1:40 a.m. on December 27, 2013. Upon entering the residence, he observed pruning shears on the couch and blood on the floor. He asked if anyone was in the house, and stated either that he was a deputy sheriff or that he worked for the Tulare County Sheriff's Department. J.P. noticed his office door was open; as he walked inside the office, Jake attacked him and they struggled for several minutes. During the struggle, J.P. was able to call 911 on his cell phone. After J.P. gained control of Jake, Jake placed J.P.'s pinky finger into his mouth and bit down on it while attempting to break free. J.P. was able to maintain control of Jake until officers arrived.

A protective sweep of the residence revealed no other suspects. Items of J.P.'s property were observed in a pile on top of the washer and dryer, but his duty firearm, Taser, and body armor were missing. His and his girlfriend's firearms were found a short time later in a small pile of items inside the garage. J.P. subsequently determined the point of entry was a side garage door that had been left unsecured. J.P. noted small pry marks on the door. At some point, it was discovered Jake had struck or cut J.P.'s small terrier dog inside the residence, possibly with pruning shears from the garage or a knife.

J.P. required four stitches in his finger. Jake also received medical treatment. When questioned at the hospital, Jake said it was easy for him to break into the deputy's residence because police are idiots. The dog, a 7.3-pound Maltese mix that was not quite two years old, needed several stitches to close a large wound on her shoulder, but was otherwise in good health.

5.

The probation officer's report contained a statement from Jake, who was now 17 years old. Jake reported he was highly intoxicated from alcohol at the time of the incident, having consumed about three 30-packs of beer earlier in the day. He said he was unable to recall some of his actions, did not plan the burglary, and did not recall why he tried to take the victim's property. Jake also claimed he did not know how he entered the residence or remember hurting any dog.[6] Questioned further, Jake said he panicked when the victim came in. When the victim had his fingers in Jake's eyes while detaining Jake, Jake was scared and bit down on a finger to get the victim off of him. Jake acknowledged the stupidity of what he did, and expressed his belief alcohol played a significant role in his actions. Jake claimed he would never have committed such an offense if sober, and he expressed remorse.

Jake also related that a day after he was placed on the electronic monitor, he was at school when a small bindle of methamphetamine fell out of his pocket in front of school officials. Afraid of being arrested and returned to JDF, he ran from the school and resided with his girlfriend until the current offense.[7] Jake admitted smoking marijuana daily and drinking an average of a 30-pack of beer by himself every two weeks. He revealed continued association with Northern gangs, but denied joining them in any criminal behavior.[8]

---

[6] The probation officer noted that during the detention/intake assessment on December 27, 2013, Jake said he used pruning shears to break into a house where no one was home, found the victim's guns in a bedroom, and stabbed the victim's dog with a knife he had in his pocket.

[7] According to the school truancy officer, Jake was searched prior to entering school and was in possession of methamphetamine and a bundle of money.

[8] The report also related that while detained at JDF on the present matter, Jake received disciplinary referrals for assaulting another minor during class; communicating with in-custody adults, disobeying staff orders, and being disrespectful toward staff while transitioning from court to a transport vehicle; engaging in disruptive behavior, disrespecting staff, and flooding his toilet; initiating a verbal altercation and disobeying staff orders; and being involved in a physical altercation with another minor.

Jake reported he was in good health, with no major medical problems. His mother reported he was diagnosed with attention deficit hyperactivity disorder (ADHD) in fifth or sixth grade. Jake was prescribed clonidine for the condition, but no longer took the medication because he did not like the way it made him feel.

The probation officer listed two circumstances in mitigation and 11 in aggravation. The officer related that recommending Jake be recommitted to YCCU was considered, but deemed inappropriate due to the severity of the current offenses. The officer found Jake did not appear to be genuinely sincere in his expressions of remorse, and Jake essentially blamed his involvement on alcohol. In addition, the officer found Jake appeared to be heavily involved in gangs. Because of Jake's continued delinquent behavior and repeated failures to comply with terms and conditions of probation, the officer concluded Jake was in need of a more substantial period of time in custody than local services could provide, in order to adequately meet his rehabilitative needs. As a result, the probation officer recommended Jake be committed to DJJ for the maximum confinement term in light of the numerous aggravating, and minimal mitigating, factors.

On March 12, 2014, Jake admitted the probation violations stemming from the incident at school. The court then proceeded to disposition. It stated it had read and considered the probation officer's report and recommendation, and asked if either party wished to address the recommended disposition of DJJ commitment for a term of nine years six months, less 695 days credit for time served. The People asked the court to follow the recommendation based on the serious nature of the offense and Jake's repeated delinquent history; Jake's counsel asked the court to consider not imposing the "upper term, based on the mitigating factors set forth in the report."

The court informed the parties that, despite their stipulation to a DJJ commitment, it was required to exercise its own independent judgment and discretion in that regard. It noted there were two issues before it: Should Jake be committed to DJJ and, if so, what should be the maximum period of confinement?

7.

With respect to the first issue, the court noted it was required, by section 725.5, to consider Jake's age, the circumstances and gravity of his offenses, and his previous delinquent history, in addition to any other relevant and material evidence. In addition, section 734 prohibited it from committing Jake to DJJ unless the court was fully satisfied Jake's mental and physical conditions and qualifications were such as to render it probable he would be benefited by the reformatory educational discipline or other treatment provided by DJJ. The court then stated:

> "Counsel, with respect to the minor's age, he presently is 17.… So he is close to majority age. He is not a younger ward of the court. And it appears to the Court that he was in a position to make appropriate judgments with respect to his behavior .…

> "Turning to the circumstances and gravity of the offense.… [¶] … [¶]

> "When the Court considers the fact that he broke into a home, used force to break into the home, attacked the dog that was there to protect the home, there were guns in the home, fought with the homeowner, once the homeowner came home, and injured the homeowner, the Court finds that those circumstances are very grave and serious.

> "In looking at the minor's previous delinquency history, the minor has a substantial delinquency history, and it is apparent to the Court that although … substantial efforts have been made to reform this minor, those efforts have not succeeded because the minor continues to offend and each offense is greater in nature as the minor has aged.

> "In terms of reviewing his mental and physical condition and qualifications, there are no factors here that would cause the Court not to place the minor in the Division of Juvenile Justice.

> "After considering these elements, the Court finds it probable that the minor will benefit from the reformatory educational discipline or other treatment provided by [DJJ]."

The court then turned to setting the maximum period of confinement. It noted that under section 731, subdivision (c), a ward committed to DJJ cannot be held in physical confinement for a period of time in excess of the prison commitment that could be

imposed on an adult convicted of the same offense or offenses, and that such a ward cannot be held in physical confinement for a period of time in excess of the maximum term set by the court based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the juvenile court.  It stated:

> "Essentially what this code section provides for is that the Court must review the factors in setting a mitigated, which would be the low, the mid term, or the aggravated term for the current offense.
>
> "With respect to circumstances in mitigation, the minor has expressed remorse for his actions.  He voluntarily acknowledged wrongdoing at an early stage of the criminal proceedings.  That certainly weighs in the minor's favor.
>
> "Then the Court must also consider circumstances in aggravation. And these are the factors in aggravation that the Court considers:  The victim's dog was particularly vulnerable as it was unable to protect itself when the minor stabbed it with his knife.  The minor inflicted physical injury to both the victim and his dog.  The minor was an active participant. The manner in which the crime was carried out demonstrates planning and criminal sophistication or professionalism on the part of the minor.
>
> "As he told the intake probation officer, he used the pruning shears found inside the home to break into the victim's residence and found guns in the victim's bedroom.
>
> "Although the minor expresses remorse for his actions now, at the time he told Officer Stephens of the Visalia Police Department how easy it was for him to break into the deputy's residence because, as he said at the time, 'police are idiots.'
>
> "The minor's prior record of criminal conduct indicates a regular, increasing serious criminal conduct.  The minor's prior performances on grants of informal and formal probation were unsatisfactory.  And at the time that this offense was committed, the minor was on formal probation.
>
> "The adverse collateral consequences on the minor's life resulting from the current petition appears to be minimal.  He's been afforded several opportunities to reform his negative behavior but repeatedly failed to comply with terms and conditions of probation despite his many commitments in a custodial program.

"Again, the minor's prior grants of formal probation were dismissed unsatisfactory.

"This crime involved great violence, threat of great bodily harm, and other acts disclosing viciousness or callousness.

"The minor has engaged in violent conduct and is a serious danger to society.

"The minor has prior sustained petitions which are numerous.

"So … in taking the mitigating and aggravating factors into consideration, the Court finds that the factors in aggravation outweigh the factors in mitigation.

"Accordingly, on this petition alone, the Court is going to select the aggravated term. And the aggravated term in Count 2, which is the principal term, it provides for a commitment of two years, four years, or six years. The Court is going to select the aggravated term of six years.

"Count 1, the Court is going to take one-third the mid term — that's a two, three, four — so that will be one year.

"And then Count 3 is a 16-month, two-year, or three-year term. The Court is going to take one-third the mid term of two years.

"The total commitment on the current petition is seven years, eight months.

"The Court will also take into consideration his prior petitions. And based on the term from all prior petitions, his total term is nine years, six months, less 695 days credit for time served."

## **DISCUSSION**

Jake challenges the juvenile court's setting of his maximum term of confinement at the maximum allowable by law. He appears to contend both that the court misunderstood its discretion and that it abused its discretion.**9**

---

**9** At one point in his opening brief, Jake asserts the evidence demonstrated that lesser restrictive alternatives were never realistically considered in rehabilitating him. In light of the parties' stipulation to a DJJ commitment (see *In re Travis J.* (2013) 222 Cal.App.4th 187, 198-199) and the thrust of the remainder of Jake's argument on appeal, we do not read this comment as a challenge to the DJJ commitment itself, but rather an

An appellate court "reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; accord, *In re Asean D.* (1993) 14 Cal.App.4th 467, 473.) "When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion. An appellate tribunal is not authorized to substitute its judgment for that of the trial judge. [Citation.]" (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65; see *In re Todd W.* (1979) 96 Cal.App.3d 408, 416.) Rather, the standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

"A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) To uphold a DJJ commitment on appeal, "there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJJ] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.]" (*In re Angela M.*, *supra*, 111 Cal.App.4th at p. 1396.) In addition, "[t]o exercise the power of judicial discretion, all material facts and evidence must be both known and considered, together with legal principles essential to an informed, intelligent and just decision. [Citation.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 165.) Generally, "where the record *affirmatively* discloses that the trial court *misunderstood* the scope of its discretion, remand to the trial court is required to permit that court to [act] … with full awareness of its discretion …." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 944; accord, *People v. Bruce G.* (2002) 97 Cal.App.4th 1233, 1245-1246; *People v. Jeffries* (2000) 83

argument the court failed to consider committing Jake for less than the maximum possible term.

11.

Cal.App.4th 15, 26.)  Similarly, "when the record shows that the trial court proceeded …

on the erroneous assumption it lacked discretion, remand is necessary so that the trial

court may have the opportunity to exercise its … discretion at a new … hearing.

[Citations.]  [Juveniles] are entitled to '[commitment] decisions made in the exercise of

the "informed discretion" of the … court,' and a court that is unaware of its discretionary

authority cannot exercise its informed discretion.  [Citation.]"  (*People v. Brown* (2007)

147 Cal.App.4th 1213, 1228; accord, *In re Sean W.* (2005) 127 Cal.App.4th 1177, 1181-

1182.)

In deciding whether the juvenile court acted arbitrarily or irrationally with respect

to a DJJ commitment in a particular case, we assess the record, and evaluate the exercise

of discretion, in light of the purposes of the Juvenile Court Law.  (*In re Michael D.*

(1987) 188 Cal.App.3d 1392, 1395; see *In re Lorenza M.* (1989) 212 Cal.App.3d 49, 57-

58.)  "Under section 202, juvenile proceedings are primarily 'rehabilitative' (*id.*,

subd. (b)), and punishment in the form of 'retribution' is disallowed (*id.*, subd. (e))" (*In

re Eddie M.* (2003) 31 Cal.4th 480, 507); however, the law recognizes punishment as a

tool of rehabilitation, and strives to provide for the protection and safety of the public as

well as each minor under the juvenile court's jurisdiction (§ 202, subds. (a) & (b); *In re

Asean D.*, *supra*, 14 Cal.App.4th at p. 473; *In re Michael D.*, *supra*, 188 Cal.App.3d at

p. 1396).

In determining the appropriate disposition, the juvenile court is required to

"consider, in addition to other relevant and material evidence, (1) the age of the minor,

(2) the circumstances and gravity of the offense committed by the minor, and (3) the

minor's previous delinquent history."  (§ 725.5.)  In order for a minor to be statutorily

eligible for a DJJ commitment, his or her most recent offense must be listed in

subdivision (b) of section 707.  (§ 733, subd. (c); see *In re D.B.* (2014) 58 Cal.4th 941,

944.)  "The Legislature's primary purpose in enacting [section 733, subdivision (c)] was

to reduce the number of juvenile offenders housed in state facilities by shifting

responsibility to the county level '"'for all but the most serious youth offenders."'" [Citations.]" (*In re D.B.*, *supra*, at p. 948.) Jake admitted committing assault by means of force likely to produce great bodily injury, an offense listed in subdivision (b)(14) of section 707. He thus falls within the group of juvenile offenders deemed most serious by the Legislature.

In setting the maximum length of a DJJ commitment, two other statutes also come into play: section 726 and section 731. Section 726, subdivision (d) provides, in pertinent part:

> "(1) If the minor is removed from the physical custody of his or her parent … as the result of an order of wardship made pursuant to Section 602, the order shall specify that the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the … offenses which … continued the minor under the jurisdiction of the juvenile court.

> "(2) As used in this section and in Section 731, 'maximum term of imprisonment' means the longest of the three time periods set forth in paragraph (3) of subdivision (a) of Section 1170 of the Penal Code, but without the need to follow the provisions of subdivision (b) of Section 1170 of the Penal Code ….

> "(3) If the court elects to aggregate the period of physical confinement on multiple counts or multiple petitions, including previously sustained petitions adjudging the minor a ward within Section 602, the 'maximum term of imprisonment' shall be the aggregate term of imprisonment specified in subdivision (a) of Section 1170.1 of the Penal Code …."[10]

Section 731, subdivision (c) provides:

> "A ward committed to [DJJ] may not be held in physical confinement for a period of time in excess of the maximum period of imprisonment that could be imposed upon an adult convicted of the offense or offenses that brought or continued the minor under the jurisdiction of the

---

[10]    Effective January 1, 2013, subdivision (c) of section 726 was redesignated subdivision (d), without substantive change. (Stats. 2012, ch. 176, § 3.) Some of the opinions we cite refer to subdivision (c) of the statute, as does Jake.

juvenile court.  A ward committed to [DJJ] also may not be held in physical confinement for a period of time in excess of the maximum term of physical confinement set by the court based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the juvenile court, which may not exceed the maximum period of adult confinement as determined pursuant to this section.…"

Although juvenile courts have broader dispositional discretion than do adult courts directly subject to the determinate sentencing law (DSL), the DSL nonetheless has indirect application in juvenile proceedings, as demonstrated by the foregoing statutory provisions.  (*In re Jovan B.* (1993) 6 Cal.4th 801, 809-810.)  Section 726 provides the general restriction applicable whenever a minor is removed from a parent or guardian's physical custody due to a section 602 wardship finding:  The minor may not be held in confinement for a period longer than an adult's maximum period of imprisonment — i.e., the DSL's aggravated term — for the identical offense, or, in the case of multiple felony counts and/or petitions, an adult offender sentenced to consecutive terms for multiple felonies.  (*In re Jovan B.*, *supra*, 6 Cal.4th at p. 810; *In re Alex U.* (2007) 158 Cal.App.4th 259, 264; *In re Alex N.* (2005) 132 Cal.App.4th 18, 26.)  When a minor is both removed from parental custody due to a wardship finding *and* is committed to DJJ, section 731 not only restricts the length of confinement to the maximum period of imprisonment for an adult without regard to aggravating or mitigating circumstances, but also requires the court to base the maximum term of physical confinement on the facts and circumstances of the minor's offenses.  (*In re Alex N.*, *supra*, 132 Cal.App.4th at p. 26.)  Taken together, the statutes give a juvenile court discretion not only to impose a maximum term of physical confinement equal to an adult's maximum period of imprisonment for the identical offense or offenses, but also to impose a shorter maximum term of physical confinement on the basis of the facts and circumstances of the case (*In re Alex U.*, *supra*, 158 Cal.App.4th at p. 264; *In re Carlos E.* (2005) 127 Cal.App.4th 1529, 1533) — even one that is lower than the minimum sentence that might be imposed

14.

on an adult for the same offense or offenses (*In re A.G.* (2011) 193 Cal.App.4th 791, 795, 806) or one that does not match one of the three terms established by the DSL for a given offense (*In re H.D.* (2009) 174 Cal.App.4th 768, 776).

The record of the dispositional hearing in the present case shows the juvenile court was aware it had to determine both whether Jake should be committed to DJJ and, if so, for how long. The record also shows the court took into account the considerations set forth in section 725.5, and knew it had to consider the facts and circumstances of the case when determining the appropriate maximum period of physical confinement, which could not exceed the maximum period of imprisonment for an adult. Jake's attorney requested the court consider not imposing the maximum term based on the mitigating factors set out in the probation officer's report, to which the court replied, "I appreciate that you wish for me to impose the lower term." Thus, the court clearly realized it had discretion to set a lesser term of physical confinement than the maximum permitted by law.[11] The question, then, is whether the trial court exceeded the bounds of reason, all of the circumstances being considered, by setting Jake's maximum term of physical confinement at the longest permissible term.

The reasons the court gave for its decision are quoted at length, *ante*. "'[W]here, as here, the juvenile court sets the maximum term of physical confinement at [DJJ] at the maximum term of an adult confinement, the record must show the court did so after considering the particular facts and circumstances of the matter before it.' [Citation.]" (*In re Christian G.* (2007) 153 Cal.App.4th 708, 714.) The record on appeal contains the requisite showing. Moreover, although a juvenile court is not required to adhere to the

---

**11**    It appears the court may have believed it was limited to choosing one of the three terms to which an adult would be subject under the DSL. Because it set Jake's maximum term of physical confinement at the highest term allowed by law, any misunderstanding in this regard was harmless, because nothing suggests the court wished to set a lower term or a term that did not conform to the DSL triad.

aggravating/mitigating circumstances scheme applicable to the sentencing of adult felons (*id.* at p. 715), we are cited to no authority precluding the court from using such circumstances as guidelines in determining the appropriate maximum term.

Jake claims the court failed to consider the evidence and arguments presented at the dispositional hearing, and considered only issues related to punishment and retribution for Jake's behavior. The record belies his assertion. Jake faults the court for giving "short shrift" to various allegedly mitigating factors and only mentioning two, even though, he claims, the facts of the case showed others. Everything Jake mentions was contained in the probation officer's report, however, which the court twice stated it had read and considered. We will not assume the court failed to consider the circumstances to which Jake now points. (See *In re Julian R.* (2009) 47 Cal.4th 487, 491, 495, 498-499; *In re Ricky H.* (1981) 30 Cal.3d 176, 183-184.) "The court was not required to take all the information properly considered by it at face value" (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329) and, by analogy to sentencing proceedings under the DSL, could properly "minimize or even entirely disregard mitigating factors without stating its reasons. [Citations.]" (*People v. Salazar* (1983) 144 Cal.App.3d 799, 813.)

"To support a [DJJ] commitment, it is required that there be evidence in the record demonstrating probable benefit to the minor, and evidence supporting a determination that less restrictive alternatives are ineffective or inappropriate." (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576.) However, "less restrictive placements do not actually have to have been tried." (*Id.* at p. 577.) Jake contends there was no "real" evidence he will be unable to complete the treatment he needs and his rehabilitation in less time than a maximum commitment will allow, but we disagree. Jake's total inability to follow the rules when not confined, gang involvement, and increasingly serious criminal offenses — all of which were documented in the probation officer's report — amply demonstrate the need, both in terms of Jake's rehabilitation and the protection of the public, for a lengthy period of confinement, especially in light of the fact Jake was almost an adult. While

16.

Jake argues his most recent offenses showed no planning or criminal sophistication, and that his entire delinquency history "was simply the unfortunate manifestation of his mental health condition [ADHD] and other environmental factors," the court was not required to view Jake's conduct that way.[12] To quote Jake, "Just saying it's so, will not make it so."

Jake also contends there was no evidence his mental health needs will be addressed and treated at DJJ, or that DJJ is even equipped to do so, "regardless of Jake being incarcerated in that institution for more than nine years." The court expressly found "[t]he mental qualifications of this youth render it probable that the youth will benefit from the reformatory discipline or other treatment provided by [DJJ]." Substantial evidence supports this finding, regardless of DJJ's ability (or inability) to treat Jake's mental health needs. (See *In re Robert D.* (1979) 95 Cal.App.3d 767, 773.)

Jake's apparent belief he will necessarily be confined for more than nine years warrants mention. Such a belief, if genuine and not mere hyperbole, misapprehends the nature of a DJJ commitment and the maximum period of physical confinement. "[W]hile the length of an adult's incarceration is determined in large part by the court's sentence, the length of a juvenile's commitment is determined by DJJ, independent of the juvenile court's maximum term of confinement. The maximum term serves only as an upper limit on DJJ's custody. [Citation.]" (*In re A.G.*, *supra*, 193 Cal.App.4th at p. 805, fn. 12.) "Minors most often do not serve their maximum terms, but the statutory maximum may affect both parole eligibility and the extent to which actual confinement may be prolonged for disciplinary reasons. [Citations.]" (*In re Jovan B.*, *supra*, 6 Cal.4th at p. 811.) Thus, if Jake is indeed capable of completing his needed treatment and

---

[12] We note the record contains evidence Jake made the choice to stop taking the medication he was prescribed for his condition.

rehabilitation in less time than his maximum commitment length, presumably he will be released from physical confinement at such earlier time.

To summarize, the juvenile court considered all the proper factors in committing Jake to DJJ and setting the maximum period of physical confinement. Substantial evidence supports its findings of probable benefit and rejection, as inappropriate or ineffective, of less restrictive alternatives. (See *In re Travis J.*, *supra*, 222 Cal.App.4th at p. 200; *In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.) "[A DJJ] commitment made with some punitive purpose is proper where consistent with the rehabilitative purposes of the Juvenile Court Law and not retributive. [Citation.]" (*In re Tyrone O.* (1989) 209 Cal.App.3d 145, 152.) The juvenile court here did not abuse its discretion.

## DISPOSITION

The judgment is affirmed.