Filed 9/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B263022 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA047579) |
| v. | |
| MICHAEL X. BELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark C. Kim, Judge.  Affirmed.

Christopher Hawthorne for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Michael Xavier Bell appeals from the judgment imposed after he was resentenced to a combined state prison term of 43 years to life for multiple violent acts, including robbery, rape, and assault with a firearm that occurred when he was 14, contending that his parole eligibility date at age 55 violates the equal protection and cruel and unusual punishment provisions of the state and federal Constitutions. We disagree and affirm the judgment.

## FACTS

The lengthy, quoted portion of our statement of facts, including the first five footnotes, is taken verbatim from this court's first decision in this matter. (*People v. Bell* (July 31, 2003, B158891) [nonpub. opn.] (*Bell I*).) "Appellant's offenses occurred on the evening of December 10, 2000, nine days before his fifteenth birthday, at two homes on a block in Torrance where he had previously resided. Viewed in accordance with the governing rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence showed that shortly after 6:00 p.m., appellant knocked on the door at the home of Locke Lane, Jr., a former neighbor and friend. Lane opened the door and found appellant standing with another young male.[1] They asked if they could use the phone, and Lane admitted them, explaining that his father was using it. The three went into the living room, where Lane resumed playing games on a PlayStation that was attached to the television.

"Appellant's accomplice left to use the bathroom. When he returned, he held an automatic handgun to Lane's head, and told him to put the video gear on the bed. Lane put the game controller there, and the accomplice told appellant to throw a Nintendo system on the bed too, which he did. When Lane's 15-year-old brother appeared, appellant's accomplice placed the gun inside his jacket. The brother departed, and appellant and his accomplice unhooked the PlayStation. Appellant asked Lane where he could put it. Lane indicated a pillowcase, and appellant placed the two video game systems into it, together with some games.

---

[1] The identity of appellant's accomplice, whom we refer to as such, was not shown at trial.

"Lane's mother entered the living room from the kitchen, and asked Lane where the PlayStation was. Lane said he didn't know. His brother reappeared and dumped out the contents of the pillowcase. Although appellant then claimed that Lane had offered to lend him and his accomplice the systems, Mrs. Lane told them to leave, and they did. Lane, nervous and upset, told his mother not to go outside, because the visitors had a gun.

"About an hour later, appellant and his accomplice rang the doorbell at the home of E.M. and her son, a few houses down the block. Appellant had previously lived in the house in back of Ms. M.'s, and she recognized him. When Ms. M. answered the door, appellant and his accomplice asked if they could use her phone. She declined and closed the door, but it remained partly open. When she moved to shut it fully, Ms. M. saw appellant and his accomplice inside the house, the accomplice holding an automatic handgun. She demanded to know what they were doing, and they told her to shut up, one of them saying, 'I'm going to kill you.' Appellant's accomplice pointed the gun at Ms. M.'s eight-year-old son and told him not to scream. The accomplice demanded to know where Ms. M.'s money was, and she informed him and told him to take it.

"Appellant then took the gun from his companion. He asked where the clip was, and the accomplice told him it was loaded. Appellant put the gun to Ms. M.'s head, and told her that she was going to give him 'head.' He forced her into the kitchen, ripped open her sweater, and ordered her to remove her pants, which she did, along with her underwear. Appellant sat on a chair and made her unbuckle his pants and open them. Holding the gun to her head, he forced her mouth onto his penis. Ms. M. saw her son pressing his head into a pillow on a couch, as appellant had commanded. Appellant then made her lie on the floor, saying, 'You're going to like this.' He proceeded to rape her, then dismounted her and recommenced, the gun still at her head.

"During the acts, appellant's accomplice reappeared, stepped over appellant and Ms. M., and inquired if there were any 'brewskies.' Referring to Ms. M., appellant asked the accomplice if he wanted 'some of this.' The accomplice declined. Appellant eventually got up and went into Ms. M.'s son's room. At that point, Ms. M. ran to the door in an attempt to escape, but the intruders caught up with her and pushed her onto the

3

couch, where her son was sitting. Appellant's accomplice then took Ms. M. into the kitchen, saying 'You're going to give me some head.' He sat on the chair, opened his pants, and told her to put her mouth on his penis. She complied. He then told her to stand up and bend over the counter, and tried without success to penetrate her. After failing to do so with her seated on him, he ordered her to lie on the floor, got on top of her, and raped her, holding the gun to her head.

"When the accomplice stopped and went to Ms. M.'s bedroom, she sat down with her son, who tried to cover her with a blanket. Appellant appeared, pointed the gun at her, and ordered her to remove her gold jewelry and give it to him, which she did. Appellant's accomplice told her to wash herself, and she did so with a sponge in the kitchen sink. The accomplice told Ms. M. to understand that they were looking for Christmas gifts. He said he was just 15 and had three children.[2] He also told Ms. M.'s son to stay in school, 'so this doesn't happen to him.'

"Appellant's accomplice then asked to use Ms. M.'s car, which was in her driveway, and she gave him the keys, telling him he could take it. Handing appellant the gun, he went out to the car. Appellant then took Ms. M., who was still naked, back into the kitchen, and raped her again. Ms. M. heard the car's horn honking, but appellant did not get off of her until his accomplice returned and told him, 'C'mon.'

"Appellant stated that they had to tie up Ms. M. and her son, and the accomplice said he would take her with him. He repeated this when appellant displayed a telephone with a cord that had been ripped from the wall. Ms. M. put on some clothes, as the accomplice directed. Appellant then told him not to forget the television in the son's room. The accomplice handed appellant the gun and got the TV.

"Appellant's accomplice walked outside, followed by Ms. M., who was "sandwiched" close between him and appellant. They walked toward her car, which was now on the street with the engine running, at least 36 feet from the door they had exited. When the accomplice bent down to put the TV in the car, Ms. M. ran screaming down the

---

**2**      At trial, Ms. M. estimated that both of the intruders were in their 'Late teens, early twenties."

street.[3]  A neighbor let her phone the police.  When she returned home, the intruders were gone with her car, having left the television in the street.

"Ms. M. flagged down a police car that had responded to her call.  Officers took her and her son to San Pedro Peninsula Hospital, where a sexual assault nurse examined her and took swab samples from her genital area, breasts, and mouth area.  The examination disclosed vaginal lacerations, consistent with forcible intercourse.  While at the hospital, Ms. M. identified appellant from a photographic display.  She also identified him at trial.[4]  The next day, Ms. M. returned to her house and found that the bedrooms had been ransacked and numerous additional items of jewelry were missing.

"On December 14, 2000, Los Angeles police officers went to the home of appellant's girlfriend, and found appellant, dressed in his underwear, hiding in her closet.  After being arrested and handcuffed, appellant broke away and fled outside.  He was apprehended more than an hour later, hiding in a trash bin.  The officers recovered items of Ms. M.'s jewelry that appellant's girlfriend was wearing, having been given them by appellant the day before. Subsequently, the girlfriend's mother found a loaded semi-automatic handgun in a neighbor's car in her apartment building's carport.

"A Los Angeles police detective obtained oral swab samples from appellant, for DNA comparison with Ms. M.'s samples.  The forensic laboratory director at Cellmark Diagnostics testified that, upon analysis, the vaginal sample contained DNA consistent with appellant's, with a one-in-21-billion frequency, and that he was a possible donor to the breast sample.

"Appellant did not offer an affirmative defense. In closing argument, his attorney contested the sufficiency of the proof of kidnapping, which the information alleged both as a substantive offense and as an aggravating circumstance of the sexual offenses ([Pen. Code,] § 667.61, subd. (e)(1)). Counsel suggested that there might have been only an

---

**3**   Ms. M. testified, 'We were walking towards the car.  And I knew if I got in the car with them, I would be dead' . . . .

**4**   Locke Lane, Jr., and his mother also did so.

5

attempted kidnapping, and an attempted rather than completed robbery of Locke Lane, Jr. After the jury retired to deliberate, the court granted appellant's motion under section 1118.1 with respect to the kidnapping charge under section 667.61.[5]"

Bell was convicted of: three counts of robbery (Pen. Code, § 211); three counts of forcible rape (§ 261, subd. (a)(2)); two counts of forcible oral copulation (§ 288a, subd. (c)); one count of kidnapping to commit rape or robbery (§ 209, subd. (b)(1)); and one count of assault with a firearm (§ 245, subd. (a)(2)).[6] The jury also found true allegations that he committed those crimes during the commission of a residential burglary for purpose of the One Strike law (§ 667.61, subd. (e)(2), (3)) and that a principal was armed with a firearm during the commission of these crimes (§ 12022, subd. (a)(1)). He was given a determinate term of 28 years and 8 months, along with an indeterminate term of 25 years to life for the One Strike sentence.

## PROCEDURAL HISTORY

This case has a long and complicated procedural history. In 2003, this court affirmed the judgment after modifying it in two respects: (1) by reducing the kidnap for robbery/rape count to attempted kidnapping for that purpose based on insufficiency of the evidence; and (2) by striking the armed principal enhancement as to the assault count while directing that the assault count sentence be stayed. (*Bell I, supra*.)

On remand, Bell was resentenced to 54 years to life. He appealed and we reversed and remanded for resentencing because the trial court, and not the jury, determined the facts that supported a finding concerning certain aggravating factors that led to imposition of the upper term sentence as to one of the robbery counts, in violation of *Blakely v. Washington* (2004) 542 U.S. 296. (*People v. Bell* (Feb. 10, 2005, B171066) [nonpub. opn.] (*Bell II*).)

---

[5]     The prosecutor had argued that this kidnapping occurred when Ms. M. tried to escape from the house and appellant and has accomplice brought her back from the door. The alleged aggravated kidnapping involved the movement of Ms. M. out the driveway door and the car.

[6]     All further undesignated section references are to the Penal Code.

6

The California Supreme Court granted review and transferred the matter back to us to reconsider our decision in light of *People v. Black* (2005) 35 Cal.4th 1238, which affirmed the validity of California's sentencing scheme and its delegation to the trial court of fact-finding power concerning sentence-related aggravating factors. We then affirmed the judgment. (*People v. Bell* (Jan. 30, 2006, B171066) [nonpub. opn.] (*Bell III*).)

In *Cunningham v. California* (2007) 549 U.S. 270, the United States Supreme Court overruled *Black, supra,* 35 Cal.4th 1238, and held that California's sentencing scheme was unconstitutional because it permitted judges, not juries, to make factual findings concerning aggravating sentencing factors. Bell's case eventually made its way back to this court for reconsideration in light of *Cunningham*. We affirmed, concluding that even though the trial court erred, the error was harmless because no reasonable jury would have found that the robbery in count 2 had not involved great violence. (*People v. Bell* (Feb. 27, 2008, B171066) [nonpub. opn.] (*Bell IV*).)

Following a series of decisions by the United States and California Supreme Courts that forbade life without parole sentences for juvenile non-homicide offenders, including sentences that did not offer the opportunity for parole within a meaningful portion of the offender's life span, Bell filed a habeas corpus petition with the trial court contending that his sentence of 54 years to file amounted to cruel and unusual punishment because it was a defector sentence of life without parole. In response to that petition, the trial court resentenced Bell to a combined state prison term of 43 years to life, as follows: 25 years to life on one of the rape counts, and a determinate term of 18 years on the other counts. The trial court also ordered that Bell would become eligible for parole in December 2040, when he would be 55.

Bell makes the following contentions on appeal: (1) his age 55 parole eligibility date is a de facto life without parole sentence and is therefore cruel and unusual under *Graham v. Florida* (2010) 560 U.S. 48, 63-64 (*Graham*); (2) his sentence is unconstitutionally cruel and unusual because it is grossly disproportionate when compared to the parole eligibility date available to most juvenile homicide offenders; and

7

(3)  the exclusion of One Strike offenders from section 3051 violates equal protection principles.

## DISCUSSION

1.    *Principles Applicable to Determining Whether Punishment Is Cruel and Unusual*

We begin our discussion with a review of the law of cruel and unusual punishment and recent decisional and statutory law regarding sentencing of juvenile defendants.  We then turn to the points raised on appeal.

When considering a proportionality challenge to the length of a sentence under the Eighth Amendment to the United States Constitution, we consider all the circumstances of the case.  We begin by comparing the gravity of the offense and the severity of the sentence.  In the rare case where this threshold comparison leads to an inference of gross disproportionality, we then compare the defendant's sentence to the sentences received by offenders both in California and other jurisdictions.  If this comparison bears out the initial assessment that the sentence is grossly disproportionate, then the sentence is cruel and unusual.  (*People v. Christensen* (2014) 229 Cal.App.4th 781, 805-806.)

Determining whether a sentence is cruel or unusual under Article I, section 17 of the California Constitution employs a three-part analysis:  (1)  We examine the nature of the offense and the offender; (2)  we compare the punishment in this case with the punishment imposed for more serious crimes in California; and (3)  we compare the punishment with that imposed for the same crime by other jurisdictions.  (*People v. Em* (2009) 171 Cal.App.4th 964, 972.)  A defendant must overcome a considerable burden to show his sentence is disproportionate to his level of culpability, and findings of disproportionality are exquisitely rare in case law.  (*Ibid.*)

2.    *The Evolving Law Concerning Sentencing of Juvenile Offenders*

In *Graham, supra,* 560 U.S. 48, the United States Supreme Court announced a categorical rule prohibiting life without parole (LWOP) sentences for minors who were convicted of non-homicide offenses.  *Graham's* holding was based on the following: (1)  scientific studies showing fundamental differences between the brains of juveniles and adults; (2)  a juvenile's capacity for change as he matures, which shows that his

crimes are less likely the result of an inalterably depraved character; (3) the notion that it is morally misguided to equate a minor's failings with those of an adult; and (4) the fact that even though non-homicide crimes may have devastating effects, they are cannot be compared to murder in terms of severity and irrevocability. (*Id.* at pp. 67-70.)

In *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455] (*Miller*), the Supreme Court held that sentencing schemes that made LWOP sentences mandatory for juveniles who commit homicide offenses violated the Eighth Amendment's ban on cruel and unusual punishment. Under *Miller,* LWOP sentences are still permissible, but may be imposed on only the "rare juvenile offender whose crime reflects irreparable corruption. [Citations.]" (*Id.* at p. 2469.) This determination must be made as part of a sentencing scheme that requires trial courts to take into account the "distinctive (and transitory) mental traits and environmental vulnerabilities" of children. (*Id.* at p. 2465.)

Mandatory LWOP sentences for juveniles "preclude[] consideration of [their] chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds [them] – and from which [they] cannot usually extricate [themselves] – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of [their] participation in the conduct and the way familial and peer pressures may have affected [them]. Indeed, it ignores that [they] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, [their] inability to deal with police officers or prosecutors (including on a plea agreement) or [their] incapacity to assist [their] own attorneys." (*Miller, supra,* 132 S.Ct. at p. 2468.) Accordingly, trial court sentencing of juvenile homicide offenders must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), the California Supreme Court applied *Graham* to non-homicide juvenile offenders who receive a sentence which, although subject to the possibility of parole, is so long that it amounts to a de facto

9

LWOP sentence. Under *Caballero*, the sentence for a juvenile non-homicide offender must provide a "meaningful opportunity to demonstrate [his] rehabilitation and fitness to reenter society in the future" and must take into account all the mitigating circumstances, including the juvenile's age, role in the crime, and physical and mental development. (*Id.* at pp. 268-269.)

In response to *Caballero,* the Legislature enacted section 3051, which sets mandatory parole eligibility dates for most persons convicted of crimes committed before they turned 23: (1) at the 15th year of incarceration if the sentence is a determinate term; (2) at the 20th year of incarceration if the sentence is a life term of less than 25 years to life; and (3) at the 25th year of incarceration if the sentence is a life term of 25 years to life. (§ 3051, subd. (b)(1)-(3).) These provisions do not apply if the juvenile was sentenced: (1) under the Three Strikes law (§§ 667, subds. (b)-(i) and 1170.12, subds. (b)-(i)); (2) under the One Strike law for committing certain felony sex offenses (§ 667.61); or (3) to life without possibility of parole. (§ 3051, subd. (h).) Bell's sentence included a term of 25 years to life because he committed a burglary in order to carry out a rape and did so with a firearm, thus falling into the One Strike sentencing scheme. (§ 667.61, subd. (e)(2), (3).) As a result, the mandatory minimum parole eligibility requirements do not apply to him.

3.      *Bell's Parole Eligibility Date Does Not Amount to Cruel and Unusual Punishment*

Bell contends that his age 55 parole eligibility date is unconstitutionally cruel and unusual for three reasons: (1) it amounts to a de facto LWOP sentence because the possibility of parole comes too late to leave him with a meaningful life expectancy; (2) it is grossly disproportionate to the punishment for more serious crimes such as special circumstances murder because section 3051 requires a parole eligibility date at 25 years after incarceration for that offense, while he is not eligible for parole for 41 years; and

(3) it did not adequately account for his horrific childhood, which was marked by abuse, neglect, and mental illness.[7]

Although a parole eligibility date must occur while a defendant has some meaningful life expectancy remaining, how much life expectancy that entails is somewhat of an open issue. (*People v. Perez* (2013) 214 Cal.App.4th 49, 57-58 (*Perez*).) The *Perez* court held that an age 47 parole eligibility date could "by no stretch of the imagination" be considered a de facto LWOP sentence. (*Id.* at p. 58.) We believe that rationale applies to Bell's age 55 parole eligibility date and that, standing alone, the eligibility date is not a de facto LWOP sentence. The record does not suggest that Bell would not have a meaningful life expectancy.

As for Bell's disproportionality argument, he relies on *In re Nunez* (2009) 173 Cal.App.4th 709, where a 14 year old convicted of kidnapping for ransom received an LWOP sentence.[8] Noting that the defendant could have received no more than 25 years to life had he committed murder instead, the *Nunez* court held that the LWOP sentence was "among the rarest of the rare" because he was the only known offender under age 15 to receive an LWOP sentence throughout the nation. The *Nunez* court therefore reversed the LWOP sentence. (*Id.* at pp. 715, 726.)

*Nunez* is inapplicable here. Bell did not receive an LWOP sentence: he was sentenced to 43 years to life with parole eligibility after 41 years at age 55. Bell committed multiple violent crimes of a horrific and devastating nature. He broke into the victim's home in order to commit rape, raped and robbed her at gunpoint in front of her eight-year-old son, and tried to kidnap her in order to facilitate his crimes. Even taking into account the admittedly unfortunate circumstances of Bell's childhood, we cannot say

---

[7] In *People v. Franklin* (2016) 63 Cal.4th 261, our Supreme Court held that section 3051's mandatory parole eligibility requirements mooted a juvenile defendant's claim that his prison sentence was cruel and unusual. *Franklin* is inapplicable here for two reasons: (1) the defendant in that case was eligible for a 25-year parole hearing under section 3051, while Bell's One-Strike conviction made him an exception to that requirement; and (2) *Franklin* did not address the equal protection issue raised by Bell.

[8] The sentence in *Nunez* was imposed before *Graham* was decided.

11

that his age 55 parole eligibility date makes this the "rarest of the rare" cases where the punishment is grossly disproportionate to the crimes he committed.  We therefore conclude that Bell's sentence was not cruel and unusual under either the federal or California Constitutions.

4.   *Excluding One Strike Offenders From Section 3051 Was Not an Equal Protection Violation*

Both the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee to all persons the equal protection of the laws.  In order to succeed on his equal protection claim, Bell must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.  (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836 (*Wilkinson*).)

Although respondent contends that Bell has failed to meet this hurdle because violent rapists and special circumstances murderers are not similarly situated, we will assume for purposes of our analysis that the two groups are similar, consisting of violent juvenile offenders.  We apply different levels of scrutiny to different types of classifications.  (*Wilkinson, supra,* 33 Cal.4th at p. 836.)  Relying on *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), Bell contends that we must apply the highest level of scrutiny – strict scrutiny – which requires a showing that the classification bears a close relationship to a compelling state interest, is necessary to achieve the state's goal, and is narrowly drawn to reach that goal by the least restrictive means possible.  (*People v. Cole* (2007) 152 Cal.App.4th 230, 238.)

Noting that personal liberty was a fundamental right, the *Olivas* court applied the strict scrutiny test to strike down a sentencing scheme that allowed juvenile wards to be held in custody beyond the maximum term of imprisonment for the crime they committed.  (*Olivas, supra,* 17 Cal.3d at p. 838.)  We believe *Olivas* is not applicable here.  As the Supreme Court has noted, *Olivas* concerned only the maximum term for which a juvenile offender could be held, and was inapplicable where the issue was "the method by which he may obtain release prior to expiration of the full term imposed."

(*People v. Austin* (1981) 30 Cal.3d 155, 162 [juvenile wards not entitled to sentence reduction by way of conduct credits applicable to state prison inmates].)

The court in *Wilkinson, supra,* 33 Cal.4th 821, clarified *Olivas's* limited reach. The defendant in *Wilkinson* was convicted of battery on a custodial officer (§ 243.1), which was a felony. He argued on appeal that the felony classification violated equal protection principles because battery that resulted in injury under a different code section (§ 243) was a "wobbler" offense that could be treated as a misdemeanor. The *Wilkinson* court rejected that contention by applying the rational basis test. In doing so, the Supreme Court held that *Olivas* was limited to the principal that the boundaries between the adult and juvenile criminal systems be maintained. (*Wilkinson,* at pp. 837-838.) Otherwise, a defendant does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives. (*Id.* at p. 838.) Application of strict scrutiny in other cases would "be incompatible with the broad discretion the Legislature traditionally has been understood to exercise in defining crimes and specifying punishment." (*Ibid.*)

Therefore, because the purported statutory disparity does not implicate a suspect class or fundamental right, we apply the deferential rational basis test when examining the Legislature's sentencing choice. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*); *Wilkinson, supra,* 33 Cal.4th at p. 838.) This standard does not depend on whether the Legislature ever actually articulated its purpose, and the underlying rationale need not be empirically substantiated. While the realities of the subject matter cannot be completely ignored, we may engage in "rational speculation" as to the justifications for the Legislature's decision, even if our assumption has no foundation in the record. (*Ibid.*) Under this test, Bell must negate every conceivable basis that might support the legislative distinction. If a plausible basis exists for the provision, we may not second guess its wisdom, fairness, or logic. (*Ibid.*)

When applying the rational basis test, " 'we must accept any gross generalizations and rough accommodations that the Legislature seems to have made.' [Citation.] 'A classification is not arbitrary or irrational simply because there is an "imperfect fit

13

between means and ends," ' [citation] or 'because it may be "to some extent both underinclusive and overinclusive." ' [Citation.]" (*Johnson, supra,* 60 Cal.4th at p. 887.) "At bottom, the Legislature is afforded considerable latitude in defining and setting the consequences of criminal offenses." (*Ibid.*)

The *Johnson* court employed this test to overrule its earlier decision in *People v. Hofsheier* (2006) 37 Cal.4th 1185 (*Hofsheier*), which held that a mandatory sex offender registration requirement applicable to those who orally copulate minors (§ 290) had no rational basis and therefore violated the Equal Protection clause in light of a companion requirement for discretionary sex offender registration for those who engaged in unlawful intercourse with a minor.

The *Johnson* court disagreed with *Hofsheier* that there could be no plausible explanation for having discretionary sex offender registration for the crime of intercourse with a minor and mandatory sex offender registration for those who orally copulated minors. First, it cited studies showing that sex offenders could more easily manipulate minors into having oral sex instead of intercourse. As a result, the Legislature could have plausibly assumed that those sexual predators had more opportunities to reoffend. (*Johnson, supra,* 60 Cal.4th at pp. 883-884.) Second, legislative concerns over the costs of supporting children born to underage mothers might also have motivated the Legislature to permit discretionary registration of intercourse sex offenders to prevent interference with the father's "employment opportunities and the support of children conceived as a result of unlawful intercourse. . . ." (*Id.* at pp. 885-886.)

Bell contends there can be no rational basis for treating him more severely than a juvenile who commits the far more serious crime of special circumstances murder, especially in light of the California Department of Corrections and Rehabilitation, 2010 Juvenile Justice Outcome Report (the Department of Corrections report) showing that juvenile sex offenders recidivate far less often than those who commit other crimes. Respondent contends a rational basis exists for the Legislature's decision to exclude One Strike rapists from the mandatory minimum parole eligibility requirements of section 3051 because Bell's One Strike sentence was based on his commission of multiple

14

offenses, including rape, burglary with the intent to commit rape, and assault with a firearm. Respondent adds that even if juvenile sex offenders recidivate less frequently than others, they still recidivate, justifying their exclusion from section 3051.

We believe the threat of recidivism gives rise to a rational basis for the Legislature's decision to exclude One Strike offenders from section 3051. We begin by noting that Three Strikes offenders were also excluded from section 3051. Because the Three Strikes law is geared toward repeat offenders, we believe the statutory scheme suggests that the Legislature had recidivism in mind when it excluded One Strike offenders.

We also find persuasive that the Legislature has enacted several comprehensive statutory schemes that all seem to focus on the Legislature's concerns over recidivism by those who commit violent sex offenses. The Sexually Violent Predators Act (Welf. & Inst. Code, § 660, et seq.) provides for the indefinite civil commitment of certain offenders who are found to suffer from a qualifying mental disorder after the completion of their prison terms. The Mentally Disordered Offenders Act (Pen. Code, § 2690, et seq.) permits the continued detention of certain other sex offenders until they receive appropriate mental health treatment that results in remission of their disorder. Each has the same purpose: to protect the public from a select group of sexual offenders who are extremely dangerous and to provide treatment for them. (*People v. Landau* (2013) 214 Cal.App.4th 1, 46; *People v. Ward* (2002) 97 Cal.App.4th 631, 636.)

Section 290 requires the lifetime registration of a large class of sex offenders, including those commit assault or kidnapping with the intent to commit rape. (§ 290, subd. (c).) The purpose of section 290's lifetime registration requirement is to ensure that persons convicted of the enumerated crimes be readily available for police surveillance at all times because the Legislature has deemed them likely to commit similar offenses in the future. (*People v. Jeha* (2010) 187 Cal.App.4th 1063, 1080.)

As we see it, the Legislature believes that most sex offenders pose a recidivism risk. We believe the Legislature had that concern in mind when it excluded One Strike

15

offenders such as Bell from the reach of section 3051, and that the risk of recidivism provides a rational basis for doing so.

Bell relies on the Department of Corrections report to show that juvenile rapists have a low recidivism rate. That report examined recidivism among juvenile offenders, including those who committed violent non-sex offenses, violent sex offenses, and other less serious crimes. Although the 2010 report concluded that juvenile violent sex offenders had a lower recidivism rate than most other types of offenders, there were no statistics available for juvenile homicide offenders, perhaps because such offenders tend to be denied parole even when eligible.[9] In any event, one report that reaches contrary conclusions does not mean that the Legislature's classification of crimes is unreasonable.

Based on this, and given the deferential standard we must apply, we cannot say that the Legislature lacked a rational basis for its sentencing choice.

## DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.                                    GRIMES, J.

---

[9]     We also note that even though the 2010 report showed that juvenile rapists had a lower recidivism rate than many other types of offenders, that rate was still high. For instance, as measured by arrests, the recidivism rate was 78.7 percent for serious/violent crimes, 64.7 percent for non-violent sex offenders, and 67.7 percent for violent sex offenders. (2010 report, p. 28) As measured by the rate of commitment or other forms of custody, the recidivism rate was 56.9 percent for serious/violent crimes, 28.1 percent for non-violent sex offenders, and 46.9 percent for violent sex offenders. (2010 report, p. 28.) By another measure, the three-year return rate to state incarceration for violent rapists was 37.8 percent. (2010 report, p. 30.)

16